[No. 30354.   Department Two.   March 16, 1948.]

J. WALTER BURR *et al., Respondents,* v. R. L. CLARK
*et al., Appellants.*[1]

[1]Reported in 190 P. (2d) 769.

*Simmons & McCann,* for appellants.

*Pat Myers,* for respondents.

STEINERT, J.—Plaintiffs instituted this action to recover compensation for damage done to their residential heating system, alleged to have been caused by the negligence of the defendants' employee while making repairs to a part of the heating equipment. The action was tried to the court, without a jury. The trial court made findings of fact, stated its conclusions of law, and entered judgment in favor of plaintiffs. Defendants appealed.

At the time involved in this action, respondents J. Walter Burr and Pearl V. Burr, husband and wife, were the owners of and occupied a six-room house situated in the Georgetown district of Seattle. The house was built in 1941, and, during its construction, a hot water heating system was installed in the basement.

This heating system included an automatic coal stoker and a secondhand cast-iron Arco (American Radiator Com-

pany) furnace boiler composed of sections put together and bolted with bush nipples. The system was of the closed, rather than the open, type. The distinguishing difference between the two types of hot water heating systems, as explained by an expert witness, is that the closed type employs a relief valve and an air compression tank to relieve excess water pressure, whereas the open type has an expansion tank in the attic of the house and a vent pipe leading through the roof to carry off excess water.

In the instant case, the furnace boiler, which was set in a corner of the basement, was equipped with several safety devices, including a relief valve, a compression tank, an "aquastat," and a water pressure gauge. The relief valve and compression tank were located back of the boiler, near the outside wall of the building, and served to prevent the accumulation of water pressure in the boiler. The aquastat, fastened onto the flow line from the boiler, controlled the operation of the coal stoker, which supplied heat to the boiler according as the temperature rose or fell. The water pressure gauge, mounted on the front of the boiler, contained a dial with figures thereon numbering from zero to approximately 60. Actual pressure in the boiler was indicated on the dial by a movable black hand. The danger mark, indicating excessive pressure, was shown by a stationary red hand set almost vertically at about 25.

According to the expert witness, boilers of this type are manufactured to operate under thirty pounds working pressure for hot water. Respondents had been told by the prior owners of the house that, when the pressure dropped, they were to open the inlet valve and admit water into the boiler until the black hand "came back to correspond with the red hand," but under no consideration should they ever allow the black hand to get beyond the red one.

During the morning of September 25, 1945, Mrs. Burr, one of the respondents herein, discovered that the furnace was not properly heating the radiators and that an unusual amount of coal in the stoker was smoldering, instead of burning freely. She reported the matter by telephone to her husband, who told her to send for someone to remedy

the situation. Having seen the name "Genesee" on the stoker, she telephoned to that company, a copartnership composed of the appellants herein. Mr. Gordon F. Clark, one of the appellants, answered the 'phone. Mrs. Burr told him that they were having trouble with the furnace, that it was full of coal which was smoldering, that she was afraid of it, and that she wanted him to send a man out to "check" the furnace. Mr. Clark was unable to send a man at once, but stated that he would do so as soon as he could.

Mrs. Burr reported the result of the conversation to her husband and at the same time told him that she was "still worried." Mr. Burr thereupon told her to "clean out" the coal stoker. Mrs. Burr then took all of the coal out of the stoker and, because the coal was smoldering, set it outside in metal buckets.

That evening, between six and seven o'clock, one of appellants' repairmen, Dormer Smith, referred to as George by Mr. Burr, arrived at respondents' house. Smith was a mechanic with fifteen years' experience in the heating service business. Mr. Burr conducted Smith to the basement and explained to him what little he, Burr, knew about the furnace, including what he had been told about the indicator gauge on the boiler. Smith discounted what the prior owners had said about the gauge and the warning that Mr. Burr had received from them. Burr testified:

"We had a discussion about this valve. And he [Smith] explained that the fellow who had warned me of this gauge, this George [Smith], said that he was mistaken, that the system is set up so that the water pressure automatically took care of itself; if you should run the gauge clear full it would overflow through some source he mentioned on the roof. He said there was a tank in the attic and the overflow would come out onto the roof. I said, 'There has never been any overflow on the roof here, nor is there a tank in the attic.' "

Smith then built a fire in the furnace and admitted water into the boiler by turning the inlet valve. Thereupon, the black hand proceeded around the dial until it was arrested by a needle fixed at the figure 60, thus indicating continuously increasing pressure. Mr. Burr, who was watching

the gauge to see what the black hand would do, observed that, after coming to rest, it did not move backward as Smith said it would. Thereupon, the following occurred, as testified by Burr:

"And I told this man [Smith], 'This hand isn't falling back.' 'Well,' he says, 'that's all right, it will. It is supposed to. That is the way they are fixed,' he says. So by that time the fire was getting a pretty good start, getting pretty hot. And my wife come down then. And so again I told George [Smith], I says, 'Well, this gauge may be supposed to come back, but it isn't moving, it hasn't done a thing.' Well, George says, 'Well, it will come back.' And as he reached and opened the valve and let more water into the boiler . . . the boiler blew up. The hot water blew all over the basement."

Appellants' version of the event, as testified by Smith, differs in some respects from that of the respondents as set forth above. Smith testified that Burr warned him about the gauge only once, and that the boiler burst as he was putting water into it for the first time.

A subsequent investigation with reference to the boiler and stoker by Mr. J. R. Baldwin, a boiler expert, who was brought to the Burr premises by one of the appellants, disclosed that the aquastat was out of order and that the relief valve was defective. He testified that, in his opinion, the bursting of the boiler was due to excess pressure, although he did not know whether water pressure or steam pressure was the cause. He further testified that, if the water pressure had been kept at 25 or below, as marked on the gauge, the boiler would not have burst; also, that if the relief valve had been working properly, the boiler would not have burst. Appellants' witness Smith was of the opinion that the bursting of the boiler was due to pressure from the water main, not from pressure caused by heat induced by fire in the stoker; he thought the fire was not hot enough at that time to cause such pressure.

After the accident, respondents inquired of appellants whether they were going to repair or replace the damaged apparatus at the latter's expense. Appellants refused to assume any blame. Thereafter, respondents employed

Mr. J. R. Baldwin, a heating contractor of thirty years' experience, to make the necessary repair or replacement. Mr. Baldwin had installed the original heating system in the house.

Baldwin testified that he found it necessary to install a new boiler, as it was impossible during the war years to get the parts required for the repair of the old boiler.

The trial judge, who, by his own statement made during the course of the trial, is "a journeyman machinist by trade" and who had "handled all kinds of steam for many years and made those valves," considered the evidence and made a formal finding of fact that the bursting of the furnace boiler was caused by the carelessness and negligence of appellants' repairman in the following respects: (1) in filling the boiler with water beyond a safe capacity; (2) in building a "roaring fire" in the furnace when the boiler was filled with water beyond a safe capacity; and (3) in disregarding the explicit warnings and protests made by the respondents against filling the boiler with water beyond the safety point as indicated upon the water pressure gauge.

The court granted judgment in favor of respondents in the sum of $315.32, covering the cost of restoration, including the installation of a new boiler, and from that judgment this appeal was taken.

Appellants first contend that the trial court erred in finding their employee repairman negligent, and in entering judgment in favor of respondents. They base their argument with respect to negligence upon the testimony of their employee, Smith, to the effect that the boiler burst as he was admitting water into the boiler for the first and only time, and upon the presumption that Smith had the right to assume that the valve was in proper working order, since he did not know it was defective. Upon the basis of these circumstances, appellants argue that their employee was not guilty of any act of negligence, and that judgment should accordingly have been rendered in their favor. As shown above, respondents' evidence on factual issues was contrary to that of the appellants.

The trial court heard the conflicting testimony concerning the acts and circumstances transpiring prior to the sudden eruption, evaluated its weight, and found for respondents upon the facts. We are of the opinion that the evidence supports the court's findings.

Although Smith may have been entitled, at first, to rely upon the assumption that the relief valve was in proper working order, and to continue in such reliance until he had knowledge to the contrary, nevertheless, when the black hand on the dial did not go back to, or beyond, 25 and the pressure did not subside after registering 60, he had notice, or was put upon notice, that the relief valve was not working, and that the addition of more water would increase the pressure far beyond the danger point. Under these circumstances, Smith was charged with the duty to exercise at least such care as a reasonably prudent man would exercise under similar circumstances.

The duty to use care is based upon the knowledge of danger, and the care which must be used in any particular situation is in proportion to the actor's knowledge, actual or imputed, of the danger to another in the act to be performed. 38 Am. Jur. 678, Negligence, § 32; 45 C. J. 651, 653, Negligence, §§ 25, 27.

Ordinary or reasonable care is, as frequently expressed, that care which an ordinarily reasonable and prudent person would exercise under the same or similar circumstances. *Berglund v. Spokane County*, 4 Wn. (2d) 309, 103 P. (2d) 355; *Olsen v. John Hamrick's Tacoma Theatres*, 9 Wn. (2d) 380, 115 P. (2d) 718, and cases therein respectively cited.

In *Ullrich v. Columbia & Cowlitz R. Co.*, 189 Wash. 668, 66 P. (2d) 853, we defined negligence and prescribed the standard for its determination by quoting with approval the following statements found in 45 C. J. 632, 660, Negligence, §§ 2, 27:

" 'A judicial definition bringing out with admirable conciseness the elements of actionable negligence is as follows: "Negligence is an unintentional breach of a legal duty causing damage reasonably foreseeable without which breach the damage would not have occurred." ' "

" 'The actual result of an act or omission is not controlling in determining whether or not it was negligent, nor is the duty of the person doing or omitting an act to be estimated by what, after an injury has occurred, then first appears to be a proper precaution, but the question of negligence must be determined according to what should reasonably have been anticipated, in the exercise of ordinary prudence, as likely to happen.' "

The rule as stated in the last-quoted paragraph was applied in *Banks v. Seattle School Dist. No. 1,* 195 Wash. 321, 80 P. (2d) 835.

In *Arkansas Machine & Boiler Works v. Moorhead,* 136 Ark. 18, 205 S. W. 980, 1 A. L. R. 1652, the legal duty imposed upon a person who undertakes to repair machinery is set forth in the following quotation:

"One holding himself out as a machinist and accepting employment to repair a steam engine is presumed to know the character of the work he is about to do and the results likely to follow a negligent performance of his work, and is therefore liable for the damage proximately resulting from a negligent and unskillful performance of his work. *Gibson, Lee & Co. v. Carlin,* 13 Lea (Tenn.), 440; *Livermore Foundry & Mch. Co. v. Union Com. & Storage Co.,* 105 Tenn. 187, 53 L. R. A. 482; Sutherland on Damages, sec. 702."

In the annotation to the cited case, appearing in 1 A. L. R. 1654, it is stated:

"The rule supported by the decided weight of authority is to the effect that one who contracts to make repairs, and performs the work in an unskilful or negligent manner, is liable for the damage proximately resulting from the improper performance, and which can be regarded as having been within the contemplation of the parties."

For further commentary on the subject see annotation appearing in 44 A. L. R. 824.

Under the rules above stated, the trial court was justified in finding from the evidence that Smith was negligent in admitting water into the boiler under the circumstances shown to exist and concerning which he had ample notice, because he failed to exercise that degree of care owed to the respondents under those circumstances.

Appellants further contend that the proximate cause of the bursting of the boiler was the defective relief valve, and that, therefore, the trial court erred in awarding judgment for respondents.

The proximate cause of an event is that cause which, in a natural and continuous sequence, unbroken by any new, independent cause, produces that event, and without which that event would not have occurred. *Hellan v. Supply Laundry Co.*, 94 Wash. 683, 163 Pac. 9; *Eckerson v. Ford's Prairie School Dist. No. 11*, 3 Wn. (2d) 475, 101 P. (2d) 345; 1 Shearman & Redfield, Negligence (6th ed.), § 26.

It may be true, as the expert witness Baldwin testified, that the boiler would not have burst if the relief valve had been in proper working order. But, as he also testified, the boiler would not have burst if the pressure had been kept within the safe limit of 25 or less, as indicated by the gauge, even though the relief valve were not properly working at the time. The proximate cause of the damage done in this instance was the excess pressure created by the negligence of appellants' employee as heretofore described. There was no error on the part of the trial court in finding such to be the fact.

The trial court allowed respondent damages equal to the costs necessary to purchase and install a new boiler. Appellants assign this as error and contend that the proper measure of damages should have been the amount necessary either to repair the boiler, as by welding, if that were practical, or else to purchase a like secondhand boiler, plus its installation charge, and no more. Appellants argue that the cost of $315.32 for the purchase and installation of the new boiler is excessive, inasmuch as the original cost of the damaged secondhand boiler was only fifty dollars.

The expert, Mr. Baldwin, who made the new installation, testified that the old boiler could not be repaired, due to the fact that the necessary repair parts could not be obtained; that the new boiler was the only one available, of the size necessary for the particular job; that the prices indicated on the bill for the new installation were reason-

able; and that the method employed for remedying the situation was the cheapest that could be figured out.

■ The measure of damages in tort actions is that indemnity which will afford an adequate compensation to a person for the loss suffered or the injury sustained by him as the direct, natural, and proximate consequence of the wrongful act or omission. *Dyal v. Fire Companies Adjustment Bureau, Inc.,* 23 Wn. (2d) 515, 161 P. (2d) 321; 15 Am. Jur. 469, 471, Damages, §§ 65, 66; 25 C. J. S. 588, Damages, § 80.

The rule for the measurement of damages for injury to property, generally, is the same as that applicable to torts generally. 15 Am. Jur. 513, Damages, § 106; 25 C. J. S. 596, Damages, § 82.

■ In the case of real property, where the injury is only temporary, and the property can be restored to its original condition at a reasonable expense and at a cost less than the diminution in the value of the property, the general rule for the measure of damages is the cost of restoration. 25 C. J. S. 604, Damages, § 84; 15 Am. Jur. 519, Damages, § 110.

The general rule is well stated in *Koyen v. Citizens Nat. Bank,* 107 Neb. 274, 185 N. W. 413, as follows:

"Property such as fences, parts of buildings, and machinery, and furnaces, is capable of being replaced, and the proper measure of damages for the destruction thereof is the cost of restoring or replacing such property. 8 R. C. L. 484, sec. 46. If the property destroyed has no value separate and apart from the realty, the measure of damages for property destroyed is the difference between the value of the real estate before the injury and after the injury. But as to the destruction of property which is a part of the real estate, whose destruction does the realty itself no damage and is capable of being repaired or replaced, the measure is the cost of repairing or restoring the same."

Our decisions in cases involving similar situations are in accord with the rule above stated. *Koch v. Sackman-Phillips Inv. Co.,* 9 Wash. 405, 37 Pac. 703; *Clark Lloyd Lbr. Co. v. Puget Sound & C. R. Co.,* 92 Wash. 601, 159 Pac. 774; on rehearing, 96 Wash. 313, 165 Pac. 94.

■ The amount allowed by the trial court was proper under this rule.

■ Appellants further argue that respondents could have mitigated the damages by selling the damaged boiler for junk. Appellants introduced no evidence to show that it was possible for respondents to mitigate the damages in any way. It is well-settled law in this and other jurisdictions that the burden of proving mitigation of damages rests with the party whose wrongful act caused the damages. In *Norm Advertising, Inc. v. Monroe Street Lbr. Co.,* 25 Wn. (2d) 391, 171 P. (2d) 177, we set forth the rule by quotation from 134 A. L. R. 243, as follows:

" 'The overwhelming weight of authority is to the effect that in actions for damages arising out of either breach of contract or tort the burden is upon the party whose wrongful act caused the damages complained of to prove anything in diminution of the damages, or, in other words, that the damages were lessened or might have been lessened by reasonable diligence on the part of the aggrieved party.' "

In the absence of such proof by the appellants, we will not consider the question of mitigation of damages.

We perceive no error in the findings made by the trial court nor in the judgment entered thereon.

Affirmed.

MALLERY, C. J., BEALS, MILLARD, and JEFFERS, JJ., concur.