DAMPSKIBSAKTIESELSKABET DEN NORSKE AFRIKA OG AUSTRALIE-LINE, Wilhelmsens Dampskibsaktieselskab, A/S Tonsberg A/S Tankfart I, A/S Tankfart IV, A/S Tankfart V, and A/S Tankfart VI, d/b/a Wilh. Wilhelmsen, and A/S Kristian Jebsens Rederi, Plaintiffs,

v.

INTALCO ALUMINUM CORPORATION and Bellingham Stevedoring Company, Defendants,

McDOWELL–WELLMAN & CO., a corporation, Third-Party Defendants.

AMERICAN METAL CLIMAX, INC., a corporation, Plaintiff,

v.

BELLINGHAM STEVEDORING COMPANY, a corporation, et al., Defendants,

and

INTALCO ALUMINUM CORPORATION, Third-Party Defendant.

Nos. 300 and 308.

United States District Court
W. D. Washington, N. D.

Oct. 28, 1969.

Dwight L. Guy, Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for Dampskibsaktieselskabet, and others.

Earle W. Zinn, Lycette, Diamond & Sylvester, Seattle, Wash., for defendant Bellingham Stevedoring Co.

Martin P. Detels, Jr., Detels, Draper & Marinkovich, Seattle, Wash., for defendant Intalco Aluminum Corp. and plaintiff American Metal Climax, Inc.

John G. Bergmann and James H. Krider, Seattle, Wash., for McDowell-Wellman & Co., third party defendant.

BEEKS, District Judge.

The captioned actions arise out of the same casualty and were consolidated for trial and all other purposes. The Court has jurisdiction over both actions under 28 U.S.C. § 1333.

In Number 300 the partnership Wilh. Wilhelmsen, composed of Dampskibsaktieselskabet Den Norske Afrika og Australieline, Wilhelmsens Dampskibsaktieselskab A/S Tonsberg, A/S Tankfart I, A/S Tankfart IV, A/S Tankfart V, and A/S Tankfart VI (Wilhelmsen), owner of M/S TROJA and A/S Kristian Jebsens Rederi (Jebsens), time charterer of TROJA, brought action against Intalco Aluminum Corporation (Intalco), lessee of a dock, including the crane thereon, at Ferndale, Washington, used by Intalco for the discharge of bulk alumina, and Bellingham Stevedoring Company (Bellingham), who supplied the operator of the crane pursuant to a stevedoring contract with Intalco, for damage sustained when the crane boom fell upon TROJA. Mc-Dowell-Wellman & Co. (McDowell), who designed, manufactured and supervised the installation of the crane on Intalco premises, was impleaded as a third party defendant.

In Number 308, American Metal Climax, Inc. (American Metal), voyage sub-charterer of TROJA, brought action against Bellingham for damage sustained when the crane boom fell upon TROJA. Intalco was impleaded as a third party defendant.

Intalco crossclaimed against Bellingham and McDowell to recover crane repair costs.

Bellingham claims indemnity from Intalco and/or McDowell for whatever damages may be allowed against Bellingham.

Intalco claims indemnity against Bellingham and/or McDowell for whatever damages may be allowed against Intalco.

McDowell claims indemnity from Bellingham for whatever damage Intalco and/or American Metal may recover against McDowell.

On December 1, 1966 TROJA was discharging bulk alumina while moored to Intalco's dock. The discharge of the alumina was being accomplished by the use of Intalco's dock crane which was being operated by Bellingham under a stevedoring contract with Intalco. At 1705 [1] hours TROJA's number two hatch was damaged when the crane boom fell upon TROJA.

The crane operator, an employee of Bellingham, had topped the crane boom and left the crane tower at 1650.[2] The operator normally would have left the crane in the horizontal position so the next shift could immediately begin work, but because of the high wind condition (gusts up to 50 m. p. h.) he decided that it would be safer if the crane was raised to the vertical position. While on his way off the pier the operator received word the boom had fallen upon TROJA. No one else had operated the crane in the interim.

The Intalco crane required a skilled operator. Certain specific steps were to be followed by him when topping the boom:

(1) Put the bucket and the bucket carriage into the hopper;

(2) Slack the hoist and the close cables (wire ropes);

(3) Release the hand brake in the motor control room;

(4) Proceed to the boom control bridge and push the up button, which raises the boom until a limit switch automatically stops the boom just below the safety latches (dogs);

(5) Push the bypass limit switch, which raises the dogs so the boom can pass, and the up button simultaneously;

(6) Push the stop button when the boom is above the dogs;

(7) Push the down button to lower the boom into the dogs;

(8) Push the stop button;

(9) Check the dog release lever tension to insure the boom is secure in the dogs;

(10) Return to the motor control room and set the hand brake;

(11) Shut off the motor generator.

The crane operator claims to have completed all steps except 11, which he omitted because he thought the mechanics working below on the conveyor belt needed the power. The motor generator was the main power source for the crane. Undeniably if the boom was secure in the dogs and the motor generator had been shut off, the accident could not have happened.

When the boom was lowered into the dogs, pressing of the stop button would have set an electric brake and stopped the motor shutting down the apron hoist drum.[3] However, the physical evidence shows that the apron hoist drum continued to turn in a downward direction unspooling the entire amount of wire rope off the drum. As the drum continued to turn the wire rope began to randomly rewrap in a reverse direction. The wire rope wrapped around the drum shaft causing detachment of the lowering cam limit switch. One of the ropes snagged and was severed. The other rope continued to rewind raising the boom apron out of the dogs toward the king post. Since the apron hoist drum was turning in a downward direction the upper upper cam limit switch was inoperative. The wire rope, strained by the revised torque when wrapped around

1. Time approximate and not precise.

2. Time approximate and not precise.

3. While the operator was required to push the stop button, his failure to do so might not be critical under the normal situation since his shutting off the motor generator would also stop the drum from turning.

the drum shaft, drew taut and severed as the boom apron was crushed against the king post. When the wire rope severed there was a spring release action and the boom was catapulted from its vertical position against the bumper on the king post. As the boom fell it disintegrated the dogs and snapped the eye bars which normally hold it in the horizontal position. The boom landed on the number two hatch of the TROJA damaging both the ship and the crane.

As indicated, if the stop button had been pushed an automatic brake would have operated on the apron hoist drum, preventing the turning of the drum. If the hand brake had been set, it also would have operated on the apron hoist drum slowing, probably stopping, the drum from turning. Immediately following the accident the hand brake was found jammed in an open position with no damage to the ratchet. Further inspection indicated no burning or other damage to the brake drum, which would be normal if the brake had been set and the drum was turning against it.

█ I'm convinced from the great weight of the evidence and the uncontroverted physical facts that this accident resulted solely from the crane operator's negligence. The operator admits he failed to turn off the motor generator and while he may very well honestly believe that he pushed the stop button and set the hand brake, I am persuaded that he did not.

█ I find no merit in Bellingham's argument that the crane was defectively designed, constructed or installed by McDowell. The great weight of the evidence indicates no violation of the Washington Safety Standards or the standards in the industry. It was urged that McDowell should have provided the crane with "Dead Man" type of controls for raising and lowering the boom. While the existence of a dead man type of control might have prevented the accident, I entertain doubt.[4] What is clear is that the failure to provide a dead man type of control was not negligence nor was it a manufacturing defect. The crane was designed to be operated by a skilled operator and when properly operated the crane was not unreasonably dangerous. Marker v. Universal Oil Products Co., 250 F. 2d 603 (10th Cir., 1957).

█ Bellingham's argument that an electrical short in the switching mechanism could have reactivated the down button after the stop button had been pushed is also without merit. I suppose it is always true, when considering electrical equipment, that a short in the system might possibly cause unusual results. However, when weighing the uncontroverted physical facts, indicating no burning or other evidence of a short, against the mere possibility of a short, I find the shorting argument to be without evidentiary basis.

I find no merit in Bellingham's argument that the wind swayed the crane to such an extent that it possibly closed a contact within the motor starter which caused the drum to begin turning in a downward direction. The motor starter was a spring loaded horizontal contactor with a magnetic coil for closing contact and energizing. It was of the type used on high speed trolleys and in marine application, encountering velocity and vibration. The starter would not make contact unless the magnetic coil was energized by the switch or the spring was broken. An inspection indicated no repairs were necessary on the motor starter which is still being used in the crane and it is now operating with the same motor starter.

Bellingham made additional contentions relating to the time differential between topping and accident, holding power of the brake, drum phlange, sheaves, equalizing mechanism, safety

4. There was considerable evidence indicating that when used, a "dead man" control was on many occasions defeated by the operator who did not like to stand with his finger continuously on the switch. The operator would either tie or wedge the switch down so that it would continue to make connection.

hook latch, boom switching design, topping control design, and manual brake electrical interlock. After careful consideration of each contention, I find them to be speculative, and as Bellingham's other contentions, to be based on mere possibility without evidentiary basis.

■ I do not find Intalco at fault. Intalco was not in control of the crane at the time of the accident. Intalco did provide a safe berth in that both the dock and the crane were reasonably safe and not defective.

■ I have been urged to apply the doctrine of strict liability against McDowell. I do not find the crane to be in a defective condition or unreasonably dangerous to the user and thus the doctrine is not applicable. Restatement (Second) of Torts § 402A (1965). See Ulmer v. Ford Motor Co., 75 Wash.2d 537, 452 P.2d 729 (1969).

Thus, I find Bellingham responsible for the damages in the total amount of $143,527.06 as stipulated in section one of the Addendum to the Pretrial Order.

■ I also find Bellingham responsible for the overtime costs totalling $27,974.-06 as stipulated in section two of the Addendum to the Pretrial Order. These costs were necessitated by the casualty and incurred in mitigation of further damage.

■ Section three of the Addendum to the Pretrial Order deals with two items of damage claimed by Wilhelmsen, the first being the loss of use during TROJA repairs and the second being the loss of earnings in the subsequent charter due to late delivery. As to the loss of use during the two day repair period, December 12 and 13, 1966, the proper measure of damage is the net earning of TROJA but for the detention. The Narvick, 1923 AMC 263. See McNair, Mocatta and Mustill, Scrutton on Charterparties and Bills of Lading 383, 384 (1964) and annotations therein. The testimony indicates that if TROJA had continued on the Jebsens time charter she would have earned $3,332.08 for two days. Had TROJA commenced a grain voyage from Columbia River to Japan during these two days she would have earned $4,445.17 for two days. On a subsequent time charter from Japan to Australia and back, the rate was such that $3,525.06 was earned for two days. In determining the fair value of the TROJA for the two day repair period I averaged the three figures, arriving at $3,767.43 as the net earning of TROJA but for the detention. No operating costs were saved during the two day period and thus $3,767.43 is the amount recoverable against Bellingham.

■ As to the loss of earnings in the subsequent charter, it was argued that the late delivery was not proximately caused by the Intalco crane damage in that unforeseeable crane breakdown at Alcoa and an electricians' strike were intervening causes. It was also urged that "Jebsens did not dispatch its duty to mitigate and minimize damages while bringing the TROJA to the Alcoa dock." I find that the strike and the crane breakdown at Alcoa were foreseeable consequences of the original negligent act of Bellingham and were not unforeseeable intervening causes effecting the chain of causation. The mere fact that other forces have intervened between Bellingham's negligence and Wilhelmsen's injury does not absolve Bellingham where the injury was the natural and probable consequence of the original wrong and mighty reasonably have been foreseen. Fosbre v. State, 70 Wash.2d 578, 424 P. 2d 901 (1967).

■ On the question of mitigation of damages the burden of proof is on the party asserting it. Finberg Trading Co. v. Republic of China, 220 F. 2d 844 (5th Cir. 1955); Burr v. Clark, 30 Wash.2d 149, 190 P.2d 769 (1948). On the evidence before me Bellingham has not established by a preponderance of the evidence that Wilhelmsen could have avoided the strike or the Alcoa crane breakdown or have otherwise mitigated the damage. Thus I find Bellingham responsible for the $4,253.68 loss of earn-

ings in the subsequent charter due to late delivery.

■ Section four of the Addendum to the Pretrial Order contains a claim by Wilhelmsen for $1,649.39 paid to the subsequent charterer, Yuasa, to reimburse him for carrying charges due to late issuance of bills of lading. I find these charges to be remote and speculative and thus not recoverable.

■ Section five of the Addendum to the Pretrial Order contains a claim by Jebsens for demurrage paid to Wilhelmsen for the period 1705 hours December 1 through 0125 hours December 4, 1966. Jebsens, as time charterer, has no direct right to recover against the tort-feasor of owner Wilhelmsen. Robins Dry Dock and Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). However, Jebsens argues it should have subrogation rights in that it had a duty to pay or alternatively the payment was made in good faith by mistake of fact and law. Bellingham and Intalco reply that Jebsens made payment as a mere volunteer in that the TROJA could have been declared "Off Hire"[5] and thus no duty to pay existed. I need not decide whether the TROJA should have been declared "Off Hire." The evidence indicates, and the parties agree, that the damage to TROJA would not have prevented discharge of cargo had a crane been available at Intalco. Assuming arguendo, that Jebsens had no duty to pay demurrage to Wilhelmsen in that

the TROJA could have been declared "Off Hire" during the period that full working of the vessel was prevented, I find that there was reason to have a good faith doubt as to the application of Clause 15 of the Charter Party and therefore Jebsens may have believed themselves bound to pay.[6] This belief, even though mistaken, would remove Jebsens from the "mere volunteer" category and allow subrogation to Wilhelmsen's rights against Bellingham. Mosher v. Conway, 45 Ariz. 463, 46 P.2d 110 (1935); 83 C.J.S. Subrogation § 9, p. 607. See Credit Bureau Corp. v. Beckstead, 63 Wash.2d 183, 385 P.2d 864 (1963). Accordingly, I allow Jebsens recovery against Bellingham in the stipulated amount of $3,910.56.[7]

In reaching my decision with respect to liability I have been impressed by the testimony of Thomas Sparling, Homer Lupton and Robert Walker.

Other than as herein stated all claims/cross-claims for damages or indemnity are dismissed.

Taxable costs shall be assessed against Bellingham.

This Opinion shall constitute the Court's findings of fact and conclusions of law under F.R.Civ.P. Rule 52(a). Counsel for plaintiff may prepare a decree in accordance herewith and submit the same within fifteen days of the date hereof, giving ten days notice to all interested parties.

---

5. Clause 15 of the Wilhelmsen-Jebsens Charter Party reads: "That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire."

6. See The Hackney, 152 F. 520, 522 (1903) [appearing as note to The Santona]; and Stretch, I Chartering of Ships, 80.

7. Paragraph 2(t), page 6 of the Admitted Facts in the Pretrial Order.