[No. 9052-0-II.  Division Two.  July 14, 1987.]

TRANSPORT INDEMNITY COMPANY, *Appellant,* v. SKY–KRAFT, INC., ET AL, *Respondents.*

472

*Barbara J. Gazeley,* for appellant.

*Susan A. Schmid* and *Richards & Kinerk,* for respondents.

UTTER, J.*—Transport Indemnity Company appeals a summary judgment in favor of the estate of Robert Leon Schaefer, holding that an Aircraft Hull and Liability Policy (Hull policy) provided coverage for Schaefer's death. Schaefer's estate cross–appeals from a summary judgment in favor of Transport, holding that coverage did not exist under an Airport/Fixed Based Operator's Liability Policy (FBO policy). We affirm the judgment in favor of Transport, but reverse the judgment in favor of Schaefer's estate, and remand for trial on the issue of whether coverage exists under the Hull policy.

On July 1, 1981, Robert Schaefer was issued a private pilot certificate by the Federal Aviation Administration (FAA). Schaefer received instruction, supervision and examination from Sky–Kraft, a fixed base operator, located at Pearson Airpark in Vancouver, Washington. The FAA ratings granted by Schaefer's certificate were limited to "airplane single engine land", and did not include an instrument flight rules (IFR) rating. As a result, Schaefer was required to comply with visual flight rules (VFR) under the FAA visibility regulations.[1]

On August 13, 1981, Schaefer rented an aircraft from

---

*This appeal was heard by a Supreme Court Justice and two Superior Court Judges sitting as Court of Appeals Judges Pro Tempore in Division Two.

[1]The minimum visibility requirements for pilots with a visual flight rating are set forth in 14 C.F.R. § 91.105(a) (1984), which provides:

Except as provided in § 91.107, no person may operate an aircraft under VFR when the flight visibility is less, or at a distance from clouds that is less, than that prescribed for the corresponding altitude in the following table:

| Altitude 1,200 feet or less above the surface (regardless of MSL altitude)— | Flight Visibility | Distance From Clouds |
|---|---|---|
| Within controlled airspace | 3 statute miles | 500 feet below 1,000 feet above 2,000 feet horizontal |
| Outside controlled airspace | 1 statute mile except as provided in § 91.105(b) | Clear of clouds |

Sky–Kraft for a flight to Klamath Falls, Oregon. The aircraft was owned by several third parties who leased the plane to Sky–Kraft. Schaefer took off from Pearson Airpark at 6:11 a.m. and crashed approximately 4 minutes after takeoff in a wooded area 3.5 miles from the Airpark. An eyewitness observed Schaefer's aircraft plummet out of the clouds before it crashed.

Prior to takeoff, at 5:50 a.m., Schaefer obtained a weather report from the Portland flight service station, indicating that the weather at Portland International Airport was "marginal VFR." Based on this information, Schaefer filed a VFR flight plan.[2] By the time Schaefer actually departed at 6:11 a.m., however, the Portland flight service station reported IFR weather conditions existing at Portland International Airport, located across the Columbia River and approximately 4 miles from Pearson Airpark. There is no showing that Schaefer ever was aware of this, however.

On June 14, 1983, Sandra Schaefer, personal representative of Schaefer's estate, filed a wrongful death action against Sky–Kraft. The wrongful death complaint alleged that Schaefer's death was caused by the negligent entrustment and instruction by Sky–Kraft in operation of its flight school business.

At the time of the accident, Sky–Kraft possessed two

| More than 1,200 feet above the surface but less than 10,000 feet MSL— | | |
|---|---|---|
|     Within controlled airspace | 3 statute miles | 500 feet below 1,000 feet above 2,000 feet horizontal |
|     Outside controlled airspace | 1 statute mile | 500 feet below 1,000 feet above 2,000 feet horizontal |
| More than 1,200 feet above the surface and at or above 10,000 feet MSL | 5 statute miles | 1,000 feet below 1,000 feet above 1 mile horizontal |

[2]When Schaefer filed his flight plan, he stated that he knew the weather conditions were marginal VFR but that he had to get out. Clerk's Papers, at 233.

insurance policies, a Hull policy and an FBO policy. Both policies were issued by Transport. On June 22, 1984, Transport commenced a declaratory judgment action claiming that neither the Hull policy nor the FBO policy provided coverage for the claims asserted by Schaefer's estate in the wrongful death action.

In May and June 1985, Transport and Schaefer filed cross motions for summary judgment, seeking a determination of whether there was coverage under either policy. The trial court ruled that the Hull policy provided coverage for the allegations of negligence made by Schaefer's estate against Sky–Kraft and granted the estate's motion for summary judgment. The court, however, concluded that there was no coverage under the FBO policy and granted summary judgment in favor of Transport. Transport appeals the summary judgment pertaining to the Hull policy and Schaefer's estate cross–appeals the summary judgment concerning the FBO policy.

Four issues are raised on appeal: (1) whether Schaefer was "properly rated for the flight" within the meaning of the Hull policy's pilot declaration clause; (2) whether under the Hull policy Schaefer's death was an occurrence "arising out of the . . . use of the aircraft"; (3) whether Schaefer's death was caused by an accident arising "in or about the premises" or "elsewhere in the course of any work or of the performance of any duties carried out by the insured" within the meaning of the premises liability clause in the FBO policy; and (4) whether Schaefer's death was caused by an accident "arising out of the possession, use, consumption or handling of any goods . . . supplied or distributed by the insured or his employees after such goods or products have ceased to be in the possession or under the control of the insured" within the meaning of the FBO policy's completed operations and products liability clause.

A motion for summary judgment will be granted only when the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judg-

ment as a matter of law. CR 56(c); *Hartley v. State,* 103 Wn.2d 768, 774, 698 P.2d 77 (1985). An appellate court reviews a summary judgment by engaging in the same inquiry as the trial court, assuming facts most favorable to the nonmoving party. *Hartley,* at 774. With this standard in mind, we proceed to the issues before this court.

## I

Under the liability portion of the Hull policy, Transport agreed:

> to pay on behalf of the Insured all sums which the Insured [Sky–Kraft] shall become legally obligated to pay as damages because of . . . bodily injury [defined to include death] sustained by any person . . . caused by an occurrence and arising out of the ownership, maintenance or use of the aircraft . . .

Clerk's Papers, at 20. The declarations page of the policy provided in pertinent part:

> Item 7. Pilots: The *coverage* afforded by this policy *shall not apply while the aircraft is operated in flight by other than the following pilots* who hold a current and valid medical certificate from the Federal Aviation Administration and *who are properly rated for the flight involved.*

(Italics ours.) Clerk's Papers, at 18.

Transport contends that Schaefer did not have the rating required "for the flight involved" because the flight was an instrument flight rules (IFR) flight, while Schaefer held only a visual flight rules (VFR) rating. Therefore, according to Transport, Schaefer was not properly rated for the flight involved and thus was not covered by the Hull policy. Schaefer's estate claims that Schaefer was properly rated for the flight involved because he had filed a VFR flight plan, and because the weather briefing he received and weather at the field at the time he took off permitted a VFR flight.

The trial court agreed with Schaefer's estate and held that the Hull policy provided coverage for Schaefer's death. Nevertheless, in its memorandum opinion, the trial court

found that a question of fact existed as to whether Schaefer was properly rated for the flight. The court concluded that this was a factual dispute and that it would not rule as a matter of law whether Schaefer was properly rated for the conditions existing at the time of the crash. However, a week later, the trial judge wrote to counsel to clarify his reference to a "question of fact." The judge stated that his reference to Schaefer's rating was surplusage. The judge determined that "[t]he fact that Mr. Schaefer may not have been properly rated to fly the aircraft at that time and place may be an issue in the negligence action, but has no bearing on my determination that the liability policy does apply." Clerk's Papers, at 309.

In this case, the parties do not contest the meaning of "properly rated for the flight involved" as described in the Hull policy. Both parties assume that this language refers to the FAA ratings characterized above. The parties also do not dispute Schaefer's authorization to fly the aircraft or his VFR rating. Therefore, the dispositive issue is whether the fatal flight should be characterized as a VFR flight or an IFR flight.

The two leading cases for purposes of characterizing a flight as VFR or IFR are *National Ins. Underwriters v. King Craft Custom Prods., Inc.,* 368 F. Supp. 476 (N.D. Ala. 1973), *aff'd,* 488 F.2d 1393 (5th Cir. 1974); and *Glover v. National Ins. Underwriters,* 545 S.W.2d 755 (Tex. 1977). In *King Craft,* a pilot, holding only a VFR rating, began his flight under VFR conditions, but later flew into IFR weather and crashed while attempting an instrument landing. *King Craft,* at 477–78. The pilot's insurer denied coverage based on a pilot declaration clause similar to the one at issue in the instant case, which required the pilot to be "properly rated for the flight" involved. The insurer argued that the pilot was not properly rated because he crashed in the IFR weather conditions, but the trial court disagreed.

Initially, the court noted that the pilot at most violated the FAA regulations by attempting to land under IFR conditions. *King Craft,* at 478. The court then determined that

the words "the flight" used in the pilot clause referred to the entire time the aircraft was in flight. *King Craft,* at 478. The court rejected the insurer's attempt to break the flight into segments which would require different ratings for each segment. *King Craft,* at 478–79. The *King Craft* court reasoned that the segmented flight analysis would result in coverage "flickering on and off" as the aircraft entered differing weather conditions and therefore such an interpretation should be avoided unless the policy required it. *King Craft,* at 479.

Similarly, in *Glover,* a pilot holding a VFR rating began his flight under VFR conditions, but subsequently encountered IFR conditions and crashed. The same insurer involved in *King Craft* sought denial of coverage based on the pilot clause which required a pilot to be "properly rated for the flight." *Glover,* at 757. As in *King Craft,* the insurer in *Glover* urged the court to adopt the segmented flight analysis. The *Glover* court rejected the insurer's argument and agreed with the analysis in *King Craft. Glover,* at 762. The *Glover* court, however, further clarified *King Craft* by articulating a 2–step analysis for characterizing a flight as IFR or VFR. First, the flight should be looked at as a whole, rather than in segments. *Glover,* at 762. Second, the flight is to be characterized as a whole according to the weather conditions existing at the inception of the flight. *Glover,* at 762. *Accord, Northwestern Flyers, Inc. v. Olson Bros. Mfg. Co.,* 679 F.2d 1264 (8th Cir. 1982); *United States Fire Ins. Co. v. Marr's Short Stop of Tex., Inc.,* 680 S.W.2d 3 (Tex. 1984); *Ideal Mut. Ins. Co. v. Myers,* 789 F.2d 1196 (5th Cir. 1986).

The analysis in *King Craft* and *Glover* provides the court with a means to determine the character of a flight without resort to speculation or conjecture. The adoption of a "segmented flight" analysis, on the other hand, would require the court to examine every brief segment of a flight to determine whether a pilot was properly rated for that portion of the flight. Generally, in aviation accidents there is very little, if any, physical evidence or eyewitnesses to

assist the court in making a segmented analysis. Thus, a court would be forced into a process of formulating conclusions founded upon mere probabilities.

Moreover, to follow the "segmented flight" analysis would ignore the reality of unreliable weather forecasting and of sudden changes in weather conditions. The capricious nature of aviation weather and forecasts is well recognized. In a handbook for pilots studying aviation weather, J. Nelson, *Practical Guide to Aviation Weather* (2d ed. 1984), the author notes:

Reliability of Forecasts

The meteorologist understands certain principles of atmospheric behavior and has watched its behavior long enough to know how incomplete our knowledge really is. Weather, as a science, is in its infancy despite spectacular progress in recent years. It is not as exact as many other sciences and much less exact than anyone would like.

It is almost as bad for the pilot to have complete faith in weather forecasts as it is for him to have none at all. Pilots who understand the limitations of observations and forecasts are usually the ones who make the most effective use of the weather forecast service. The knowledgeable pilot continually views aviation forecasts with an open mind. He knows that weather always is changing and consequently that the older the forecast, the greater chance that some part of it will be wrong. The weatherwise pilot looks upon a forecast as *professional advice* rather than as the *absolute truth.*

J. Nelson, at 94.

In *National Union Fire Ins. Co. v. Zuver,* 47 Wn. App. 540, 736 P.2d 675 (1987), however, the Court of Appeals, Division One, rejected the analysis in *King Craft* and *Glover.* In *Zuver,* a pilot and several passengers were killed when their plane crashed into a mountain. The flight at its inception was a VFR flight, but thereafter the pilot flew into IFR conditions for which he was not rated and crashed. The pilot's insurer sought denial of coverage based on a policy exclusion which provided that the "policy does not apply . . . to any insured while the aircraft is in flight . . . if piloted by a pilot not properly certificated, qualified

and rated . . . *for the operation involved*". (Italics ours.) *Zuver*, at 543. The policy also contained a pilot warranty endorsement which referred to the same "for the flight involved" language at issue in this case.[3] The insurer argued that the words "operation involved" referred to that particular segment of the flight when the accident occurred as opposed to the conduct of the entire flight of the aircraft. Therefore, because IFR conditions existed during the segment when the accident occurred, the insurer argued that the pilot was not properly rated for the "operation involved." The trial court agreed and held that the pilot's death was excluded from coverage. *Zuver*, at 542. The Court of Appeals affirmed.

Initially, the Court of Appeals distinguished the words "operation involved" from "flight". The court determined that because the policy exclusion contained both of these terms it would be redundant to construe "operation involved" to mean the same as "flight". *Zuver*, at 544. The *Zuver* court further found that the words "operation involved" were plain and unambiguous. *Zuver*, at 544. The court, relying on the dictionary definition of the word "operation,"[4] construed the words "operation involved" to mean the "driving" of the plane, rather than the conduct of the entire flight of the aircraft. *Zuver*, at 544. In short, the court's interpretation narrowly restricted the meaning of "operation involved" to encompass that specific segment of the flight which led to the accident. The court then found that the pilot purposefully flew into the clouds and thus

---

[3]The pilot warranty clause in *Zuver* provided: "Insurance will be effective only when the operation of the insured aircraft in motion is by a pilot designated below who possess [*sic*] a current and valid pilot certificate of the kind specified with *appropriate ratings*, and a current medical certificate; all as required by the Federal Aviation Administration *for the flight involved* and who meets the additional qualifications set forth below." *Zuver*, at 541.

[4]The court defined "operation" as follows: "Operation. Exertion of power; the process of operating or mode of action; an effect brought about in accordance with a definite plan; action; activity. . . . Black's Law Dictionary 984 (5th ed. 1979)." *Zuver*, at 544.

was *operating* under IFR conditions in violation of his VFR rating. *Zuver,* at 545. Consequently, the court held that the exclusionary clause precluded coverage for the pilot's death because he was not properly rated for the "operation involved". *Zuver,* at 545. In reaching this conclusion, the court distinguished *Glover* and *King Craft* on the basis of policy language. The *Zuver* court reasoned that the policies involved in each of those cases contained wording regarding pilot ratings "for the flight" as opposed to "for the operation involved" and thus were inapplicable. *Zuver,* at 545.

■ The analysis and result in *Zuver* is unpersuasive. While the *Zuver* court correctly concluded that the term "operation involved" has a different meaning than "flight", the court's interpretation of the meaning of "operation involved" is misplaced. The dictionary definition of the term "operation" is subject to two reasonable interpretations: one would support a "segmented flight" analysis and the other would support the "inception of the flight" rule. Contrary to the court's conclusion in *Zuver,* we find that the words "operation involved" are ambiguous and must be construed against the insurer. *See Farmers Ins. Group v. Johnson,* 43 Wn. App. 39, 715 P.2d 144 (1986) (exclusionary clause will be construed against insurer when the language of the exclusion is ambiguous). Consequently, we decline to limit the term "operation involved" to a particular segment of the flight; instead we construe it to include the manner by which the entire flight of the aircraft was conducted. *See Zuver,* at 548–49 (Riley, J., dissenting). This conclusion avoids the problems discussed earlier, concerning the "segmented flight" analysis. For these reasons, we reject the result in *Zuver* and instead hold, like the courts in *Glover* and *King Craft,* that a flight is to be characterized as a whole, according to the weather conditions existing at the inception of the flight.

Additionally, Transport, relying on *United States Fire Ins. Co. v. Marr's Short Stop of Tex., Inc., supra,* urges this court to characterize the flight as IFR or VFR, depending on the pilot's knowledge of weather conditions existing

along his flight path or at his destination. Transport then argues that because Schaefer allegedly knew at his departure that IFR conditions existed along his flight path and at his destination in Klamath Falls, Oregon, the flight should be characterized as IFR. We disagree.

In *Glover,* the court held that the pilot's knowledge of weather conditions along his flight plan or at his destination was not controlling in characterizing the flight at IFR or VFR. The court refused to consider the pilot's knowledge because "very few pilots actually *know* when they take off what weather conditions they will encounter over two hours later." *Glover,* 545 S.W.2d at 763. The court noted that when a flight begins a pilot has only an expectation of what weather conditions will exist along the flight path, and that this expectation is based primarily upon the pilot's knowledge of the available weather conditions existing at departure. *Glover,* at 763. As a result, the court reasoned that an inquiry into a pilot's knowledge would involve questions as to the pilot's expectations and the reasonableness of those expectations. The court concluded that:

> Inquiries into the reasonableness of a person's actions might best be ignored in determining the coverage of an insurance policy designed to protect one from the consequences of one's own negligence, especially where the language of the policy does not clearly dictate such an inquiry.

*Glover,* at 763. Interestingly, the court, in dicta, determined that if the pilot's knowledge is important, the knowledge that he will be flying in IFR weather must exist at the flight's inception. *Glover,* at 763.

In *Marr's,* the Texas Supreme Court, seizing upon the dicta in *Glover,* held that the pilot's knowledge of weather conditions was a determinative factor in characterizing a flight. The court reasoned that, if the pilot knew from the weather information received that he would have to fly through IFR weather to reach his destination, then the flight was an IFR flight and would preclude recovery under the policy. *Marr's,* at 6.

The pilot knowledge test articulated by the majority in *Marr's* is misplaced. Such a test would require this court to adopt the precepts of negligence law for a cause of action arising out of contract construction, without any showing of causation between the pilot's knowledge or lack of knowledge and the crash. *Marr's*, at 11 (Ray, J., dissenting). Therefore, we agree with the analysis and result in *Glover* that a flight is characterized *solely* by the weather conditions existing at the point of departure.

Here, considering all of the facts and reasonable inferences in favor of the nonmoving party, a genuine issue of material fact exists as to the weather conditions existing at the inception of Schaefer's flight. The evidence presented by both parties suggests that reasonable persons would differ as to the meaning and interpretation of the weather information.

Transport presented evidence which indicated that at 6:11 a.m., when Schaefer departed from Pearson Airpark, the weather at Portland was IFR. Clerk's Papers, at 166. The record, however, only indicates that Schaefer knew that the weather at 5:50 a.m. was marginal VFR. The record does not demonstrate that Schaefer received any weather information describing the weather conditions at Portland as IFR. Transport also presented evidence from an eyewitness who observed the aircraft emerge from the clouds immediately after takeoff and just before the crash. (Affidavit of Donald Hoover, Clerk's Papers, at 180–81).

On the other hand, Schaefer's estate presented evidence indicating that when Schaefer departed from Pearson Airpark, the weather was VFR. Schaefer cites the National Transportation Safety Board report which determined that the weather was "marginal VFR." Moreover, the weather information Schaefer received at 5:50 a.m., prior to his departure, indicated VFR weather conditions in the Portland area.

The record fails to establish whether VFR or IFR weather conditions prevailed at Pearson Airpark at the time of Schaefer's departure. A genuine issue of material

fact remains as to the weather conditions existing at the inception of his flight. Summary judgment in favor of Schaefer's estate on the issue of coverage under the Hull policy was improper. The trial court's decision is reversed and remanded for trial on the issue of whether the weather conditions existing at the point of departure were IFR or VFR.

## II

Transport agreed to pay on behalf of Sky–Kraft all sums which Sky–Kraft was required to pay as damages because of bodily injury, including death, sustained by any person "caused by an occurrence and *arising out of the ownership, maintenance or use of the aircraft . . .*" (Italics ours.) Clerk's Papers, at 20.

Initially, Transport, in its opening brief, argued that Schaefer's death did not arise out of the use of the aircraft but rather out of the negligent entrustment and instruction by Sky–Kraft in operation of its flight school business, independent from the *use* of the aircraft. At oral argument, however, Transport alerted this court to *Farmers Ins. Group v. Johnson,* 43 Wn. App. 39, 715 P.2d 144 (1986), a case decided after the briefs were filed, as authority contrary to its position regarding *negligent entrustment.* Nevertheless, Transport still maintains that Schaefer's claim for *negligent instruction* was unrelated and independent from the use of the aircraft because the instruction occurred 1 month prior to the crash. We agree that *Farmers Ins. Group* disposes of Transport's contention pertaining to negligent entrustment; however, we reject Transport's argument concerning negligent instruction.

In *Farmers Ins. Group,* the primary issue was whether a homeowners policy which excluded coverage for injuries "arising out of the ownership, maintenance, operation [or] use . . ." of a watercraft also precluded coverage for injuries arising out of the negligent entrustment of a watercraft to another. The appellants argued that the exclusion was inapplicable because negligent entrustment was unrelated

to an injury "arising out of the ownership, maintenance, operation [or] use . . ." of a watercraft. *Farmers Ins. Group,* at 42. The Court of Appeals, however, rejected this argument and precluded coverage, thus following the majority view that a cause of action for negligent entrustment is indivisibly related to the ownership, maintenance, operation, or use of an instrumentality. *Farmers Ins. Group,* at 42–44.

■ Although *Farmers Ins. Group* addressed only negligent entrustment, there is no reason to distinguish between negligent entrustment or negligent instruction for purposes of this analysis. Moreover, while the question in *Farmers Ins. Group* involved "use" of a watercraft, the reasoning is equally applicable to the use of the aircraft in this case. Consequently, *Farmers Ins. Group* is persuasive authority for resolution of the issue in this case. Schaefer's estate's claims based on negligent entrustment and instruction are indivisibly related to the use of the aircraft and thus part I of the liability portion of the Hull policy is applicable.

### III

Under the FBO policy, Transport agreed, subject to the limits of liability, exclusions, conditions and other terms of the policy: "[T]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay . . . (a) for bodily injury including death . . . caused by accident . . . arising out of the hazards set forth in Section I, II, and III following." Clerk's Papers, at 64. Section I provides in pertinent part:

SECTION I—PREMISES LIABILITY

Bodily injury . . .

(a) *in or about the premises specified in the Declarations,* as direct result of services granted by the Insured

(b) *elsewhere in the course of any work or of the performance of any duties carried out by the Insured* his employees in connection with the business or operations specified in the Declarations . . .

This section is subject to the following exclusions:—

. . .

2. Bodily injury . . . caused by

. . .

(b) *any . . . aircraft owned, chartered, used or operated by or on account of the Insured . . .*

(Italics ours.) Clerk's Papers, at 64.

The trial court found that the FBO policy was intended to afford coverage in the areas not covered by the liability policy. The court concluded that because exclusion 2(b) precluded coverage for Schaefer's allegations against Sky–Kraft, the FBO policy was inapplicable in this case. Although the trial court focused on exclusion 2(b), we find there is no coverage under section I, subsection (a) or (b), and, therefore, we need not consider whether coverage is excluded under 2(b).

Initially, Schaefer's estate argues that coverage exists under subsection I(a). Schaefer's estate claims that the words "in or about" are not defined in the policy and, therefore, must be given their ordinary and popular meanings. *See, e.g., Phil Schroeder, Inc. v. Royal Globe Ins. Co.,* 99 Wn.2d 65, 659 P.2d 509 (1983), *modified,* 101 Wn.2d 830, 683 P.2d 186 (1984); *McDonald Indus., Inc. v. Rollins Leasing Corp.,* 26 Wn. App. 376, 613 P.2d 800 (1980), *aff'd,* 95 Wn.2d 909, 631 P.2d 947 (1981). Schaefer's estate defines "about" as meaning "in the vicinity" or "near", *see, e.g., Webster's New Collegiate Dictionary* 3 (1981). Because Schaefer's plane crashed "near" or "in the vicinity" of Pearson Airpark, Schaefer's estate argues that the death occurred "in or about" the insured's premises.

Schaefer's estate inaccurately defines the ordinary meaning of the term "about." Its definition includes an unlimited area surrounding the insured's premises. "About" is a term of limitation which protects the insurer from unreasonable claims arising beyond the premises of the insured. Therefore, the ordinary meaning of the term "about" does not include a broad interpretation as urged by

Schaefer, but rather should reflect a strict interpretation limiting the scope of coverage to areas within the *immediate vicinity* of the premises. This conclusion is consistent with the general definitions of "about." *Webster's Third New International Dictionary* 5 (1976) defines "about" as "in the immediate neighborhood" or "near." "Near" is defined as "at, within or to a short distance" or "direct, short." *Webster's Third New International Dictionary,* at 1510.

Here, it can hardly be said that the accident was "in or about" the premises as defined above. The plane crashed 3.5 miles east of Pearson Airpark in David Douglas City Park. Clerk's Papers, at 232. The accident did not occur within the immediate neighborhood or near the premises. We conclude there is no coverage under section I(a).

Alternatively, Schaefer's estate argues that subsection (b) provides coverage for Schaefer's death. Schaefer's estate contends that Sky–Kraft negligently dispatched or entrusted the keys of the aircraft to Schaefer the night before his flight. Schaefer's estate claims that the entrustment was a continuation of the performance of duties by Sky–Kraft, which led to Schaefer's death. Therefore, according to Schaefer's estate, the decedent died "in the course of any work or of the performance of any duties." We disagree.

■ The policy fails to define "in the course of any work or of the performance of any duties." Undefined terms in an insurance policy must be given their ordinary and popular meaning. *Phil Schroeder, Inc. v. Royal Globe Ins. Co., supra.* "In the course of" is defined as: "in the progress or process of; during." *Webster's New World Dictionary* 326 (2d College ed. 1978). "Performance" is defined as "the act of performing". *Webster's New World Dictionary* 1056 (2d College ed. 1978). These terms relate to the time, place, and circumstances under which the accident causing the injury must take place in order for coverage to apply. Therefore,

the accident causing the injury must have occurred during the ongoing performance of work or duties carried out by the insured.

■ Here, Sky–Kraft was not performing any ongoing work or duties at the time of the accident. After Schaefer obtained the keys to the aircraft, Sky–Kraft ceased performing any work in connection with its business. While Transport's allegation based on negligent entrustment is indivisibly derived from the performance of work, Schaefer's death did not occur "during" the performance of work. Transport's contention focuses on the causal relationship between the injury and the performance of duties, rather than the time, place, and circumstances under which the injury occurred. Accordingly, Schaefer's death did not occur "in the course of any work or of the performance of any duties carried out by the Insured". Thus, we conclude section I, subsection (b) does not apply.

Because there is no coverage under section I, subsection (a) or (b) we need not consider whether coverage is excluded under section I, 2(b).

IV

Having concluded that there is no coverage under subsection I(a) or (b) of the FBO policy, we must consider whether coverage exists under section II.[5] Schaefer's estate contends that because none of the coverage terms in section II are defined, they must be given their ordinary and popular meanings. According to Schaefer's estate, a plain reading of the policy favors coverage because Schaefer died while in possession of and using the aircraft supplied by

---

[5] "SECTION II—COMPLETED OPERATIONS & PRODUCTS LIABILITY Bodily injury . . . arising out of the possession, use, consumption or handling of any goods or products manufactured, constructed, altered, repaired, serviced, treated, sold, supplied or distributed by the Insured or his employees after such goods or products have ceased to be in the possession or under the control of the Insured." Clerk's Papers, at 64.

Sky–Kraft. Transport, on the other hand, argues that section II affords typical products liability coverage and was not intended to provide coverage for Sky–Kraft's negligence in operation of its flight school.[6] Transport's contention is the better view.

Products liability insurance is designed to protect the producer or manufacturer of goods against loss by reason of injury to the person or property of others *caused by* the use of a product after the product is no longer in the possession of the insured. 1 G. Couch, *Insurance* § 190 (2d rev. ed. 1984); Annot., 91 A.L.R.3d 921 (1979); *see also* 43 Am. Jur. 2d *Insurance* § 728 (1982); Annot., 45 A.L.R.2d 994 (1956). Such policies represent the application of products liability coverage to persons who in the course of their business are exposed to claims by third persons on the ground that their products caused injuries or damages after they were no longer in the possession of the insured. 1 G. Couch, *Insurance* § 1:90 (2d rev. ed. 1984).

Here, Schaefer's estate does not allege any products liability claim against Sky–Kraft. On the contrary, Schaefer's estate claims only that Schaefer died as a result of the negligent operation of Sky–Kraft's flight school. Although the use of the aircraft was indivisibly related to the accident, the aircraft itself was not the cause in fact of the injury. Therefore, as Transport correctly noted, section II was not intended to provide coverage for Sky–Kraft's negligent operation of its flight school, but rather was designed to provide coverage for injuries or damages caused by defects in goods or products. Accordingly, we find no coverage under section II.

We affirm the judgment in favor of Transport, holding coverage does not exist under the FBO policy and reverse the judgment in favor of Schaefer's estate, but remand for

---

[6]It is undisputed that the terms "goods or products" include the term "aircraft."

trial on the issue of whether coverage exists under the Hull policy.

Cox and MEINER, JJ. Pro Tem., concur.