[No. 55700–4. En Banc. January 4, 1990.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
IN
THE BOEING COMPANY, *Plaintiff*, v. AETNA CASUALTY
AND SURETY COMPANY, ET AL, *Defendants*.

NORTHWEST STEEL ROLLING MILLS, INC., *Plaintiff*,
v. FIREMAN'S FUND INSURANCE COMPANY,
ET AL, *Defendants*.

RSR CORPORATION, *Plaintiff*, v. GRANITE STATE
INSURANCE COMPANY, ET AL, *Defendants*.

JOHN FLUKE MANUFACTURING COMPANY, INC., *Plaintiff*,
v. HARTFORD ACCIDENT & INDEMNITY COMPANY,
ET AL, *Defendants*.

HARTFORD ACCIDENT & INDEMNITY COMPANY, *Plaintiff*,
v. JOHN FLUKE MANUFACTURING COMPANY, INC.,
ET AL, *Defendants*.

DAVIS WALKER CORPORATION, *Plaintiff,* v. AETNA CASUALTY AND SURETY COMPANY, *Defendant.*

*Charles C. Gordon, William A. Gould,* and *Nicholas P. Gellert* (of *Perkins Coie*); *Robert N. Sayler, James R. Murray,* and *Eric C. Bosset* (of *Covington & Burling*); *Paul R. Carlson,* for plaintiff Boeing.

*Sylvester, Ruud, Petrie & Cruzen,* by *John T. Petrie* and *Robert W. Bryan,* for plaintiff Northwest Steel.

*Don M. Gulliford* and *Robert R. Cole* (*Philip H. Gitlen, Jonathan P. Nye,* and *Whiteman, Osterman & Hanna,* of counsel), for plaintiff RSR.

*Stevan D. Phillips* and *Stoel, Rives, Boley, Jones & Grey* (*George Berger, Judith S. Roth,* and *Philips, Nizer, Benjamin, Krim & Ballon,* of counsel), for plaintiff John Fluke Manufacturing.

*Jeffrey W. Leppo, Ruth L. Piekarska,* and *Bogle & Gates,* for plaintiff Davis Walker Corp.

*Williams, Kastner & Gibbs, Jerry B. Edmonds, Patrick M. O'Loughlin, Roy A. Umlauf, Frankie A. Crain,* and *Colleen M. Cook; Carney, Stephenson, Badley, Smith, Mueller & Spellman* and *Sylvia Luppert; Carr, Goodson, Lee & Foret, Margaret Warner,* and *Michael Hooks; Thorsrud, Cane & Paulich, Mark Thorsrud,* and *Patrick M. Paulich; Merrick, Hofstedt & Lindsey, Sidney R.*

*Snyder, Jr.,* and *Ronald Dinning; Wilson, Smith, Cochran & Dickerson, Dennis Smith,* and *David M. Jacobi; Hall-mark, Keating & Abbott, William Fitzharris, Jr.,* and *Pamela Lang; Dunlap & Soderland* and *David Soderland; Sedgwick, Detert, Moran & Arnold* and *Mark C. Raskoff,* for defendants insurers.

*Bassett & Morrison,* by *W. George Bassett, Philip R. Croessmann,* and *Margaret A. Morgan,* for defendant Granite State Insurance.

*Betts, Patterson & Mines,* by *Jeffrey C. Grant* and *Margaret E. Wetherald,* for defendant Highlands Insurance.

*Lane Powell Moss & Miller,* by *Robert L. Israel, David M. Schoeggl,* and *Douglas J. Ende,* for defendants London Underwriters, et al.

*Rivkin, Radler, Dunne & Bayh,* by *Richard S. Feldman, Jeffrey Silberfeld,* and *Steven Brock; Bradbury, Bliss & Riordan,* by *John H. Bradbury* and *Carl E. Forsberg,* for defendant Hartford.

*David M. Brenner, Peter J. Kalis, Thomas M. Reiter,* and *James R. Segerdahl* on behalf of CIBA–Geigy Energy Corp., Dow Chemical Co., IBM, and NI Industries; *Carol A. Wardell* on behalf of PUD 1 of Chelan County; *Kenneth O. Eikenberry, Attorney General, Jerry Ackerman* and *Lee Rees, Assistants, George E. Greer, Linda R. Larson, Molly B. Burke,* and *Mark S. Parris* on behalf of the State, Pierce County, Port of Tacoma, Port of Seattle, Land Recovery, Inc., and Leichner Brothers Land Reclamation; *Norm Maleng, Prosecuting Attorney for King County,* and *James L. Brewer, Senior Deputy,* on behalf of King County, Clark County, and Washington Association of Prosecuting Attorneys; *Douglas N. Jewett, Seattle City Attorney, Terrence J. Cullen, Assistant; William J. Barker, Tacoma City Attorney, G. Stephen Karavitis, Assistant,* and *Robert F. Hauth* on behalf of Washington State Association of Municipal Attorneys, amici curiae for plaintiffs.

*William R. Hickman* on behalf of Safeco Insurance Co.; *Thomas S. James, Jr., P. Cameron DeVore, Donald S. Kunze, Thomas W. Brunner, James M. Johnstone,* and *Frederick S. Ansell* on behalf of Insurance Environmental Litigation Association, amici curiae for defendants.

DORE, J.—The United States District Court for the Western District of Washington has certified the following question of state law to this court:

Whether, under Washington law, the environmental response costs paid or to be paid by the insureds, as the result of action taken by the United States and the State of Washington under CERCLA, 42 U.S.C. § 9601 *et seq.,* constitute "damages" within the meaning of the comprehensive general liability policies issued by the insurers.

ANSWER: Yes.

FACTS

In 1983, the United States Environmental Protection Agency designated the Western Processing hazardous waste facility at Kent, Washington, as one of 400 hazardous waste sites requiring cleanup. On February 25, 1983, the EPA filed a complaint against Western Processing and its owners in the United States District Court for the Western District of Washington. In May 1983, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.,* the EPA notified the appellants (hereinafter policyholders) that they were generators of hazardous waste at the Western Processing site and were responsible parties for the "response costs" at this site. On July 17, 1984, the EPA and the State of Washington, as an additional plaintiff, named the policyholders in a "Second Amended Complaint" as "'generator and transporter defendants' facing potential liability for all monies expended by the government at the Western Processing site." Certification order app., at 141. On August 28, 1984, the court entered a "Partial Consent Decree" between the EPA and the policyholders for the cleanup of the surface of the Western Processing site. On April 13, 1987, the

court entered a "Consent Decree" between EPA and policyholders for the cleanup of hazardous waste contamination of the subsurface of the Western Processing site.

EPA, in its complaint, alleged that the policyholders generated or transported hazardous substances found at the site. Further, that the migration of such wastes has contaminated the groundwater, aquifer (water–bearing geological zone), commercial and agricultural property adjoining the site, and nearby surface waters. Certification order app., at 324–73, "Third Amended Complaint" filed by United States Attorneys in United States v. Western Processing Co. It further alleged that the United States, in order to combat the effects of contaminated groundwater, aquifer and property adjoining the site, had incurred and was incurring "response costs" as defined by CERCLA for which policyholders were liable. CERCLA defines the costs of "response" to include costs of removal of hazardous substances from the environment and the costs of other remedial work. 42 U.S.C. § 9601(25). CERCLA provides that any person or business entity responsible for a release or threatened release of hazardous substances "shall be liable for . . . all costs of removal or remedial action incurred by the United States Government or a State . . .". 42 U.S.C. § 9607(a)(4)(A). Pursuant to the action by EPA, the policyholders have paid and will continue to pay environmental response costs relating to the Western Processing hazardous waste facility.

During the period of time that the policyholders generated and transported hazardous wastes to Western Processing, they carried Comprehensive General Liability (CGL) insurance purchased from the respondents (hereinafter insurers). The operative coverage provision of four of the policies provide that the insurer "'will pay on behalf of the insured all sums which the insured shall become obligated to pay *as damages* because of bodily injury or property damage to which this policy applies, caused by an occurrence. . . .'" Certification order, at 3. In one case, the policy provides indemnification "'for all sums which the

Assured shall be obligated to pay . . . *for damages* . . . all as more fully defined by the term "ultimate net loss" on account of: (i) Personal injuries . . . [or] (ii) Property Damage . . .'", and goes on to define "ultimate net loss" as "'the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of . . . property damage . . . either through adjudication or compromise . . .'". Certification order, at 3. The policies do not specifically define "damages."

The policyholders sued the insurers for indemnification for the "response costs" they incurred relating to the Western Processing facility. In each case, motions for summary judgment were filed in the United States District Court. Since the motions raised a determinative question of state law, the question of whether "response costs" constitute "damages" within the CGL policies issued by insurers, this question was certified to this court. No extrinsic evidence touching upon the parties' interpretation of the coverage clause was provided in this certification. It was the intent of the district court that extrinsic evidence not be considered by this court, since the certification procedure is authorized to obtain answers to questions of law, not questions of fact.

## ANALYSIS

Under CERCLA any person responsible for an "actual release" or "threatened release" of hazardous substances is liable for response costs. The response costs paid by the insureds in the case before us concern responses to an "actual release" of hazardous substances which have already contaminated the groundwater and real property surrounding the Western Processing site. The question before us is whether these response costs to remedy an actual release of hazardous substances constitute damages within the meaning of the insureds' comprehensive general liability policies issued by insurers. In order for the policyholders to be indemnified, the plain meaning of the contract must provide coverage for the subject "response

costs."[1] Alternatively, before the insurers can avoid indemnifying the policyholders, this court must be satisfied that the plain meaning of "damages", as it would be understood by the average lay person, unmistakably precludes coverage for response costs, and any ambiguity is to be construed against the insurer.

The insurers have attempted to meet this burden by drawing lines, increasingly limited, around the word "damages." First, insurers draw a bright line between law remedies and equity remedies under common law. They assert that the legal technical meaning of "damages" includes monetary compensation for injury but not monetary equitable remedies such as sums paid to comply with an injunction or restitution. The insurers conclude that costs incurred under CERCLA are like injunction and restitution costs; therefore, they are equitable rather than legal and they are not "damages" within the policy language because equity does not award damages. The linchpin to insurers' argument is that "damages" should be given its legal technical meaning. Next, they draw a line between law remedies, excluding restitution–type law damages, such as remedies like CERCLA. Finally, they draw a line through the available common law damages and exclude everything except the tort–type damages.

The court is not persuaded that, under the rules of insurance contract analysis in Washington, the words "as damages" communicate these restrictions.

■ In construing the language of an insurance policy, the entire contract must be construed together so as to give force and effect to each clause. *Transcontinental Ins. Co. v.*

---

[1]It is important to note the absence of public policy in the construction of insurance contracts. While this case implicitly presents a grave question of policy, namely who should bear the cost of polluting our environment, the task presently before this court only requires us to construe the terms of the policies under Washington law. Washington courts rarely invoke public policy to override express terms of an insurance policy. *State Farm Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477, 481–83, 687 P.2d 1139 (1984); *Progressive Cas. Ins. Co. v. Cameron*, 45 Wn. App. 272, 282, 724 P.2d 1096 (1986).

*Washington Pub. Utils. Dists.' Util. Sys.,* 111 Wn.2d 452, 456, 760 P.2d 337 (1988). Here, the structure of the subject contracts defeats insurers' argument that "as damages" precludes coverage for cleanup costs. The subject clause, "as damages", is sandwiched into the general coverage provisions of policyholders' insurance contracts. This is an odd place to look for exclusions of coverage. *See Dairyland Ins. Co. v. Ward,* 83 Wn.2d 353, 358–59, 517 P.2d 966 (1974). Furthermore, there is nothing more in the contracts. Under the title "Exclusions", there is nothing in the enumerated exclusionary provision about "damages." Finally, there are long sections of the contracts defining all the key terms. However, there are no defining words about damages.

■ Undefined terms in an insurance contract must be given their "plain, ordinary, and popular" meaning. *Farmers Ins. Co. v. Miller,* 87 Wn.2d 70, 73, 549 P.2d 9 (1976); *Prudential Property & Cas. Ins. Co. v. Lawrence,* 45 Wn. App. 111, 724 P.2d 418 (1986). To determine the ordinary meaning of an undefined term, our courts look to standard English language dictionaries. *See, e.g., Safeco Ins. Co. of Am. v. Davis,* 44 Wn. App. 161, 165, 721 P.2d 550 (1986) (entitle); *Transport Indem. Co. v. Sky–Kraft, Inc.,* 48 Wn. App. 471, 487, 740 P.2d 319, 328 (1987) (performance); *Miebach v. Safeco Title Ins. Co.,* 49 Wn. App. 451, 454 n.1, 743 P.2d 845 (1987) (actual), *review denied,* 110 Wn.2d 1005 (1988); *Sperry v. Maki,* 48 Wn. App. 599, 602, 740 P.2d 342 (motor vehicle), *review denied,* 109 Wn.2d 1014 (1987).

The plain, ordinary meaning of damages as defined by the dictionary defeats insurers' argument. Standard dictionaries uniformly define the word "damages" inclusively, without making any distinction between sums awarded on a "legal" or "equitable" claim. For example, *Webster's Third New International Dictionary* 571 (1971) defines "damages" as "the estimated reparation in money for detriment or injury sustained". See also *The Random House Dictionary of the English Language* 504 (2d ed. 1987) (cost or expense). Indeed, even the insurers' own dictionaries define

"damages" in accordance with the ordinary, popular, lay understanding: "Damages. *Legal.* The amount required to pay for a loss." Merit, *Glossary of Insurance Terms* 47 (1980); see also Rubin, *Barrons Dictionary of Insurance Terms* 71 (1987). Even a policyholder with an insurance dictionary at hand would not learn about the coverage–restricting connotation to "damages" that the insurers argue is obvious.

Numerous federal and sister–state decisions (counsel at oral argument stated over 56 judges across the country) agree that "damages" include cleanup costs. *See Intel Corp. v. Hartford Accident & Indem. Co.,* 692 F. Supp. 1171, 1186–87 (N.D. Cal. 1988); *Aerojet–General Corp. v. San Mateo Cy. Superior Court,* ___ Cal. App. 3d ___, 257 Cal. Rptr. 621, 631 (1989) ("the great weight of authority is consistent with [Policyholder's position]"). This persuasive authority includes federal district courts in California, Colorado, Michigan, Pennsylvania, New Jersey, Missouri, Massachusetts, New York, Texas, and Delaware and state appellate courts in Wyoming, New Jersey, North Carolina, Michigan and Wisconsin. *Intel Corp.,* 692 F. Supp. at 1188 n.24.

These cases have found that cleanup costs are essentially compensatory damages for injury to property, even though these costs may be characterized as seeking "equitable relief." *United States Fid. & Guar. Co. v. Thomas Solvent Co.,* 683 F. Supp. 1139, 1168 (W.D. Mich. 1988); *CPS Chem. Co. v. Continental Ins. Co.,* 222 N.J. Super. 175, 536 A.2d 311, 316 (1988); *Intel Corp. v. Hartford Accident & Indem. Co.,* 692 F. Supp. 1171, 1186–87 (N.D. Cal. 1988). Or put another way, "coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder." *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 662 F. Supp. 71, 75 (E.D. Mich. 1987). In *United States Fid. & Guar. Co.,* the court found that once property damage is found as a result of environmental contamination, cleanup costs should be recoverable as sums

that the insured was liable to pay. According to an earlier case, *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich. App. 579, 589–90, 336 N.W.2d 838 (1983), the environmental cleanup costs are covered because they are equivalent to "damages" under state law:

> If the state were to sue in court to recover in traditional "damages", including the state's costs incurred in cleaning up the contamination, for the injury to the ground water, defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean–up itself and then suing plaintiff to recover those costs. The damage to the natural resources is simply measured in the cost to restore the water to its original state.

Courts consistently agree that the "common–sense" understanding of damages within the meaning of the policy "includes a claim which results in causing [the policyholder] to pay sums of money because his acts or omissions affected adversely the rights of third parties. . . . [*i.e.*, the public.]" *United States Fid. & Guar. Co. v. Thomas Solvent Co.*, 683 F. Supp 1139, 1168 (W.D. Mich. 1988). Even our own state trial courts have rejected the insurers' "damages" argument.[2]

In contrast to the plain ordinary meaning accorded to damages by courts across the country, insurers insist upon an accepted technical and legal meaning of damages. Insurers rely primarily on *Travelers Ins. Co. v. Ross Elec. of Wash., Inc.*, 685 F. Supp. 742 (W.D. Wash. 1988), *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem.*

---

[2]See, *e.g.*, Queen City Farms, Inc. v. Aetna Casualty and Surety Company, King County cause 86–2–06236–0 (Sept. 4, 1987) (order denying defendants' motion: re: "Damages"), *reported in* Mealey's Litigation Reports—Insurance (Nov. 24, 1987); Isaacson Corporation v. Holland–America Insurance Company, at 17–18, King County cause 85–2–12843–5 (Dec. 22, 1987).

In the Queen City Farms order at page 7, Judge Shellan rejected the insurers' argument: "[t]he average purchaser of insurance would understand the term 'damages', as used in the defendants' insurance policies, to include monies paid to clean up and remediate damage to the groundwater or other pollution damage affecting the rights of third parties . . .".

*Co.,* 842 F.2d 977 (8th Cir. 1988), and *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir. 1987), *cert. denied,* 484 U.S. 1008 (1988).

The definition of damages used by *Armco* was taken from *Aetna Cas. & Sur. Co. v. Hanna,* 224 F.2d 499, 503 (5th Cir. 1955) (damages include "only payments to third persons when those persons have a legal claim for damages"). As a very recent case stated "[i]t is not clear why the *Armco* court turned to a 30–year–old case for a definition of 'damages,' a definition which is essentially a tautology defining damages as payment to a person who has 'a legal claim for damages.'" *Aerojet–General Corp.,* 257 Cal. Rptr. at 631. The *Armco* court did express the opinion that it is a "dangerous step" for courts to construe insurance policies to cover "essentially prophylactic" or "harm avoidance" costs. *Armco,* at 1353. However, a construction of "damages" which includes equitable relief "is not a boundless universe—such 'damages' still must be 'because of' property damage. Thus *Armco*'s conclusion that an insurer would be held liable for prophylactic safety measures, taken in advance of any damage to property, is not applicable to the policies under review." *Aerojet–General Corp.,* 257 Cal. Rptr. at 632.

In *Northeastern Pharmaceutical,* the Eighth Circuit in a sharply divided en banc decision reached a similar result as in *Armco.* The majority relied primarily on the narrow, technical decision espoused in *Armco* and *Hanna.* As with the *Armco* court, the *Continental* majority was concerned that absent a limited definition of damages, "'all sums which the insured shall become legally obligated to pay *as damages.*'" would be reduced to "'*all sums* which the insured shall become legally obligated to pay.'" *Northeastern Pharmaceutical,* at 986. However, both *Armco* and *Northeastern Pharmaceutical* effectively sever "damages" from the additional restrictive phrase "because of property damage." *Northeastern Pharmaceutical, Armco* and insurers are in effect trying to write out of the CGL policy a concept that is expressly stated—that damages paid as a

consequence of property damage caused by an occurrence are covered by the policy—and to write into the policy a condition that is not there—that such sums are covered only if they have been imposed pursuant to a "legal", as opposed to an "equitable" basis for liability. The court cannot ignore the operative language of the clause itself. Our responsibility is to interpret the coverage clause as a whole. *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 456, 760 P.2d 337 (1988).

Even *Northeastern Pharmaceutical* and *Armco,* which found that "damages" do not include cleanup costs, support the policyholders' position. The reason is that these cases admit that the common meaning of the word "damages" is broad and all inclusive. In *Northeastern Pharmaceutical,* at 985, the majority conceded that:

> The dictionary definition does not distinguish between legal damages and equitable monetary relief. Thus, from the viewpoint of the lay insured, the term "damages" could reasonably include all monetary claims, whether such claims are described as damages, expenses, costs, or losses.

(Citation omitted.) *See Armco,* 822 F.2d at 1352 (limiting "the breadth of the definition of 'damages' somewhat more narrowly" than its "ordinary meaning.").

Furthermore, these cases are not helpful to the insurers' position because they are inconsistent with Washington law. In this state, legal technical meanings have never trumped the common perception of the common man. "[T]he proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract" but instead "whether the insurance policy contract would be meaningful to the layman . . .". *Dairyland Ins. Co. v. Ward,* 83 Wn.2d 353, 358, 517 P.2d 966 (1974). "The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense."

Insurers, perhaps in realizing the infirmities of *Northeastern Pharmaceutical* and *Armco,* try to argue that when legal words are used in a document, this court applies

their usual legal interpretations.[3] *See R.A. Hanson Co. v. Aetna Ins. Co.,* 26 Wn. App. 290, 612 P.2d 456 (1980). However, before an insurance company can avail itself of a legal technical meaning of a word or words, it must be clear that *both* parties to the contract intended that the language have a legal technical meaning. *Thompson v. Ezzell,* 61 Wn.2d 685, 688, 379 P.2d 983 (1963). Otherwise the words will be given their plain, ordinary meaning. *Farmers Ins. Co. v. Miller,* 87 Wn.2d 70, 73, 549 P.2d 9 (1976).

Here, there is nothing about the language from the subject standard form policies that indicates the parties intended a legal meaning to apply to the disputed term. Therefore, the words "as damages" should be interpreted in accordance with its plain, ordinary meaning, as dictated by the well established rules of construction under Washington law.

Insurers also try to argue that this court, when it is dealing with corporations, analyzes the contract language and determines its meaning without reference to what the average lay person might understand. *See Transcontinental Ins. Co.; Continental Ins. Co. v. Paccar, Inc.,* 96 Wn.2d 160, 634 P.2d 291 (1981). While *Transcontinental Ins. Co.* and *Paccar* did not talk about the average lay person, these decisions did not hold that a different rule should apply when corporations are involved. Furthermore, this court has applied the "layman" rule when dealing with corporations. *See, e.g., Phil Schroeder, Inc. v. Royal Globe Ins.*

---

[3]Carriers in their oral arguments also relied on *Detweiler v. J.C. Penney Cas. Ins. Co.,* 110 Wn.2d 99, 104, 751 P.2d 282 (1988), for the proposition of applying a legal technical definition. In *Detweiler,* the court stated "[w]here, as here, the word 'accident' is not otherwise defined in a policy, we look to our common law for definition." (Footnote omitted.) While the court said we look to the common law, the cases interpreting accident employed the popular ordinary meaning of accident as defined in the dictionaries. *See Evans v. Metropolitan Life Ins. Co.,* 26 Wn.2d 594, 605, 174 P.2d 961 (1946). Thus *Detweiler* does not support carriers' proposition that when this court is faced with a legal term, we employ the technical legal meaning of the word.

*Co.,* 99 Wn.2d 65, 659 P.2d 509 (1983) (carpet cleaning company), *modified,* 101 Wn.2d 830, 683 P.2d 186 (1984); *McDonald Indus., Inc. v. Rollins Leasing Corp.,* 95 Wn.2d 909, 631 P.2d 947 (1981) (crane company).

In any event, on the facts of this case, it is questionable whether these standard rules of construction are no less applicable merely because the insured is itself a corporate giant. The critical fact remains that the policy in question is a standard form policy prepared by the company's experts, with language selected by the insurer. The specific language in question was not negotiated, therefore, it is irrelevant that some corporations have company counsel. Additionally, this standard form policy has been issued to big and small businesses throughout the state. Therefore it would be incongruous for the court to apply different rules of construction based on the policyholder because once the court construes the standard form coverage clause as a matter of law, the court's construction will bind policyholders throughout the state regardless of the size of their business.

Insurers attempt to save themselves from these rules of construction by arguing that, in any event, criticism of *Travelers Ins. Co. v. Ross Elec. of Wash., Inc.,* 685 F. Supp. 742 (W.D. Wash. 1988) fails since it relies heavily on Washington law. In *Ross,* the matter came before the court on the insurer's motion for partial summary judgment concerning response costs. In granting the motion, the court relied on *Armco, Northeastern Pharmaceutical,* and *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.,* 81 Wn.2d 740, 504 P.2d 1139 (1973).

The *Ross* court and the insurers rely on *Seaboard* for the proposition that any lawsuit that could be characterized as a claim for equitable relief cannot constitute a claim for "damages." However, *Seaboard* does not stand for this proposition; indeed, the court's analysis supports the policyholders' position.

In *Seaboard,* the State Attorney General sought a judgment for statutory penalties and to enjoin the insured automobile dealer from "unfair methods of competition." The Attorney General also alleged that the dealer had gained possession of, and unlawfully withheld, property of members of the public, and accordingly sought "such additional orders or judgments as may be necessary to restore to any person in interest any monies or property which may have been acquired by means of an act or conduct of [defendants] found to be in violation of RCW 19.86.020." 81 Wn.2d at 742. However, the Attorney General had no authority to recover damages, only statutory penalties. 81 Wn.2d at 741.

The dealer's insurer, Seaboard Surety, sought a judicial determination that it had no duty to defend the suit because its policy required Seaboard to pay "sums which the Insured shall become obligated to pay . . . as the result of any final judgment for *money damages resulting from . . . unfair competition".* (Italics ours.) 81 Wn.2d at 741. In denying coverage, the *Seaboard* court did not rule that "damages" cannot include sums paid in restitution; instead, the court looked to the substance of the damage claim to determine whether it constituted one *for unfair competition* as ordinarily understood. The court concluded that damages for unfair competition can only be recovered by a competitor, and that a suit brought by the State to require the return of property wrongfully withheld from *customers* did not constitute such a claim.

In contrast, the substance of the claim for response costs in the present case concerns compensation for restoration of contaminated water and real property. The cost of repairing and restoring property to its original condition has long been considered proper measure of damages for property damage. *Koch v. Sackman–Phillips Inv. Co.,* 9 Wash. 405, 37 P. 703 (1894); *Olson v. King Cy.,* 71 Wn.2d 279, 428 P.2d 562, 24 A.L.R.3d 950 (1967). Consequently, the substance of the claim for response costs constitutes a claim for property damage and falls within the scope of

coverage afforded by a CGL policy. Thus *Ross* incorrectly applied the Washington law it relied on.[4]

Furthermore, when Ross Electric's counsel became aware of two superior court cases[5] that had addressed the same issue before the court, they moved for reconsideration of the damages ruling on the basis of these decisions. Judge Bryan then wrote counsel for additional briefing on whether these superior court decisions were binding or if they required certification to the State Supreme Court. Soon thereafter, the insurers settled with Ross Electric. Thus the *Ross* opinion was decided without the benefit of the reasoning of the only Washington court to have addressed the issue.

■ We are not persuaded with the cases relied on by the insurers. The *Ross* court relied almost exclusively on the logic of *Northeastern Pharmaceutical,* and *Armco* which we find faulty and it misconstrued *Seaboard.* Instead, we agree with the majority of cases across the country that the plain meaning of damages does not distinguish between sums awarded on a "legal" or "equitable" basis and that the plain meaning of damages may include cleanup costs to the extent that these costs are incurred because of property damage.

■ The policy defines property damage as "physical injury to or destruction of tangible property, which occurs during the policy period . . .". Certification order app., at

---

[4]The carriers also cite *Felice v. St. Paul Fire & Marine Ins. Co.,* 42 Wn. App. 352, 711 P.2d 1066 (1985), *review denied,* 105 Wn.2d 1014 (1986). In *Felice,* an attorney failed to remove himself as guardian of an elderly lady and paid himself attorney fees not owing to him. Therefore, the proceeding was an action to remove the guardian, not a proceeding to recover damages. Like *Seaboard, Felice* is not applicable to the issue of whether sums paid by a policyholder to clean up or to restore property damage are "damages" within the meaning of the subject CGL policy.

[5]Queen City Farms, Inc. v. Aetna Casualty and Surety Company, King County cause 86-2-06236-0 (Sept. 4, 1987) (order denying defendants' motion: re: "Damages"), *reported in* Mealey's Litigation Reports—Insurance (Nov. 24, 1987); Isaacson Corporation v. Holland–America Insurance Company, at 17–18, King County cause 85-2-12843-5 (Dec. 22, 1987).

412. "Property damage" includes discharge of hazardous waste into the water. In *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188, 1196 (9th Cir. 1986), the court held that the discharge of pollution into water caused "damage to tangible property," within the meaning of the policy defining property damage as physical injury to or destruction of tangible property. In *Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co.,* 218 N.J. Super. 516, 528 A.2d 76, 81 (1987), the court held the insurer was liable to pay as damages government mandated cleanup costs, on the ground that the costs represented a legal obligation owing because of property damage.

The issue of when costs are or are not incurred "because of" property damage is illustrated in *Aerojet,* at 635, by the following hypothetical:

> Petitioners have two underground storage tanks for toxic waste. Tank #1 has leaked wastes into the soil which have migrated to the groundwater or otherwise polluted the environment. Tank #2 has not leaked, but government inspectors discover that it does not comply with regulatory requirements, and could eventually leak unless corrective measures are taken. Response costs associated with Tank #1 will be covered as damages, because pollution has occurred. Tank #2 would not be covered. Likewise, the expense of capital improvements to prevent pollution in an area of a facility where there is none, or improvements or safety paraphernalia required by government regulation and not causally related to property damage, would not be covered as "damages."

*Aerojet–General Corp. v. San Mateo Cy. Superior Court,* __ Cal. App. 3d __, 257 Cal. Rptr. 621, 635 (1989). Thus, costs owing because of property damages are remedial measures taken after pollution has occurred, but preventive measures taken before pollution has occurred are not costs incurred because of property damage.

The occurrence of the hazardous wastes leaking into the ground contaminating the groundwater, aquifer and adjoining property constituted "property damage" and thus triggered the "damages" provision of the policies carried by the policyholders. The costs assessed against the policyholders

by the underlying lawsuits are covered by the subject policies to the extent that these costs are because of property damage. This duty to pay money is no different from the legal obligation that burdens a party who has been held liable to restore property to the condition it was in prior to the occurrence of the tortfeasor's conduct or damages consisting of amounts necessary to restore property to its status quo. *See CPS Chem. Co. v. Continental Ins. Co.,* 222 N.J. Super. 175, 536 A.2d 311, 316 (1988).

## Conclusion

■ Response costs in response to actual releases of hazardous wastes are "damages" within the meaning of CGL coverage clauses at issue. The term "damages" does not cover safety measures or other preventive costs taken in advance of any damage to property. Consequently, we concur with the great majority of judges across the country that response costs incurred under CERCLA are "damages" to the extent that these costs are incurred "because of" property damage within the meaning of the CGL coverage clauses at issue. The reported decisions across the country, the lay dictionary, the insurance dictionary, the failure of the insurance industry to write down what it meant, each of these facts lays waste to insurers' argument. For us to read the words "as damages" to exclude coverage for cleanup costs, would require this court to rewrite the principles of insurance contract analysis in Washington, and then to retroactively apply these rewritten principles to the policyholders that bought their policies decades ago. However, we decline to do this. The industry knows how to protect itself and it knows how to write exclusions and conditions. The words "as damages" do not stand exclusionary guard for the industry and represent a vast exclusion from coverage. The term "damages" is to be given its plain, ordinary meaning and not the technical meaning advocated by insurers.

The question certified by the District Court asks

[w]hether, under Washington law, the environmental response costs paid or to be paid by the insureds, as the result of action taken by the United States and the State of Washington under CERCLA, 42 U.S.C. § 9601 *et seq.,* constitute "damages" within the meaning of the comprehensive general liability policies issued by the insurers.

In answer to this question, on the facts submitted to us, we conclude that under Washington law, "response costs" incurred under CERCLA are "damages" to the extent that these costs are incurred "because of" property damage and therefore fall within the meaning of the CGL policies issued by insurers.

We answer: Yes.

UTTER, BRACHTENBACH, ANDERSEN, DURHAM, and SMITH, JJ., and PEARSON, J. Pro Tem., concur.

CALLOW, C.J. (dissenting)—We are asked in this case to determine whether an insured's liability to pay CERCLA response costs constitute "sums which the insured [has] become legally obligated to pay *as damages*" within the meaning of a standard comprehensive general liability insurance policy. As the majority opinion itself acknowledges, the plain, ordinary, and popular meaning of the word *damages* is "reparation for detriment or injury sustained." Because CERCLA response costs are not "reparation for detriment or injury sustained," CERCLA response costs are not payable "as damages" within the plain meaning of the policies at issue. The majority's contrary holding upsets settled rules of insurance construction, violates controlling precedent, and contravenes public policy.

I

CERCLA RESPONSE COSTS ARE A RESTITUTIONARY, NOT A DAMAGE REMEDY

A. *Damage remedies are compensatory; equitable remedies are coercive or restitutionary.*

Washington law defines damages as:

[T]he sum of money which the law imposes or awards as compensation, or recompense, or in satisfaction for an injury done, or a wrong sustained as a consequence, *either* of a breach of a contractual obligation or a tortious act or omission.

*Puget Constr. Co. v. Pierce Cy.,* 64 Wn.2d 453, 392 P.2d 227 (1964) (citing 15 Am. Jur. *Damages* § 2). *See also* D. Dobbs, *Remedies* § 1.2, at 3 (1973).

Damages for injury to property are measured in terms of the amount necessary to compensate for the injury to the property interest. D. Dobbs § 5.1, at 311. Therefore, damages for injury to property are limited under Washington law to *the lesser of* diminution in value of the property or the cost to restore or replace the property. *Koch v. Sackman–Phillips Inv. Co.,* 9 Wash. 405, 37 P. 703 (1894); *Burr v. Clark,* 30 Wn.2d 149, 158, 190 P.2d 769 (1948); *Hogland v. Klein,* 49 Wn.2d 216, 220, 298 P.2d 1099 (1956); *Grant v. Leith,* 67 Wn.2d 234, 235, 407 P.2d 157 (1965); *Falcone v. Perry,* 68 Wn.2d 909, 913, 416 P.2d 690 (1966); *Butler v. Anderson,* 71 Wn.2d 60, 426 P.2d 467 (1967), *overruled on other grounds in Chaplin v. Sanders,* 100 Wn.2d 853, 676 P.2d 431 (1984). *See also* D. Dobbs, *Remedies* § 1.2, at 3, § 3.1, at 135–36. Damages compensate for the injured party's loss.

Restitution stands "in bold contrast" to damages, because it is based upon a benefited party's gain. D. Dobbs, *Remedies* § 3.1, at 137. Restitutionary recovery is appropriate when the defendant has received a benefit under circumstances which make it unjust for him to retain it. *Chandler v. Washington Toll Bridge Auth.,* 17 Wn.2d 591, 601, 137 P.2d 97 (1943).

"A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, *performs services beneficial to or at the request of the other,* satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, *but also where he saves the other from expense or loss.* The word 'benefit,' therefore, denotes any form of advantage."

(Italics mine.) *Chandler,* 17 Wn.2d at 602–03 (quoting Restatement of Restitution § 1(b), at 12 (1937). The measure of recovery is the reasonable value of the benefit received by the defendant. *Noel v. Cole,* 98 Wn.2d 375, 383, 655 P.2d 245 (1982). Unlike compensatory damages, the amount of a restitutionary recovery can therefore greatly exceed the value of any property harmed. *Olwell v. Nye & Nissen Co.,* 26 Wn.2d 282, 285, 173 P.2d 652, 169 A.L.R. 139 (1946).

B. *CERCLA response costs are restitutionary.*

CERCLA authorizes the President, acting through the Environmental Protection Agency (EPA), to respond to the release or the substantial threat of a release of any hazardous substance or any pollutant or contaminant which may present an imminent and substantial danger to public health or welfare. 42 U.S.C. § 9604(a)(1); Exec. Order No. 12,316, 46 Fed. Reg. 42,237 (1981). The EPA has broad authority to take whatever response measures it deems necessary to remove or neutralize hazardous waste. 42 U.S.C. § 9604; 42 U.S.C. § 9621(a). Alternatively, the EPA may seek injunctive relief to compel "responsible parties" to take necessary response action. 42 U.S.C. § 9606(a). Private citizens also have standing to sue to force compliance with CERCLA. 42 U.S.C. § 9659(a)(1).

CERCLA permits certain governmental bodies (but not private citizens) to recover "damages for injury to, destruction of, or loss of natural resources." 42 U.S.C. § 9607(a)(4)(C). CERCLA does *not* provide for compensation to private individuals for personal injury, property damages and economic losses resulting from releases of hazardous substances. *See* section 4(a) of S. 1480, 96th Cong., 1st Sess., 125 Cong. Rec. 17,991 (1979) (providing for such liability, but eliminated from CERCLA as ultimately passed), *cited in* Brett, *Insuring Against the Innovative Liabilities and Remedies Created by Superfund,* 6 J. Envtl. L. 1, 18 & n.95 (1986).

Natural resource damages are essentially a compensatory remedy. The measure of natural resource damages is "*the lesser of*: restoration or replacement costs; or diminution of use values". (Italics mine.) 43 C.F.R. § 11.35(b)(2). Natural resource damages must be based on actual injury or loss. 42 U.S.C. § 9601(6). They are available only to governmental bodies "act[ing] on behalf of the public as trustee" of the natural resources. 42 U.S.C. § 9607(f)(1). *Artesian Water Co. v. New Castle Cy.*, 851 F.2d 643 (3d Cir. 1988). Total liability is limited to the value of the injured property. 42 U.S.C. § 9651(c); 43 C.F.R. § 11.35(b)(2).

In addition to natural resource damages, CERCLA permits both the EPA and other parties to recover costs which they have incurred as a result of a response action from "responsible parties". 42 U.S.C. § 9607(a)(4)(A), (B). Responsible parties include hazardous waste generators, hazardous waste transporters, and hazardous waste disposal facility owners and operators. 42 U.S.C. § 9607(a).

CERCLA defines the term "response" to mean "removal . . . and remedial action . . . includ[ing] enforcement activities related thereto." 42 U.S.C. § 9601(25). Among the many safety measures identified as potential response actions are monitoring, security fencing, dikes, on–site treatment or incineration, recycling, provision of alternative water supplies, and related enforcement activities. 42 U.S.C. § 9601(23), (24).

CERCLA response cost liability is essentially restitutional:

> When a party, governmental or nongovernmental, incurs response costs it is performing the duty of the responsible party. In seeking recovery of those costs under section 107(a) [42 U.S.C. § 9607(a)], that party is asking for the return of money spent on behalf of the responsible party to safeguard public health. Thus, response cost recovery restores the status quo by returning to the plaintiff what rightfully belongs to it, rather than compensating the plaintiff for loss sustained to its interest as a result of the responsible parties' wrongful conduct, and is a classic example of equitable restitution.

(Footnotes omitted.) Brett, *Insuring Against the Innovative Liabilities and Remedies Created by Superfund,* 6 J. Envtl. L. 1, 35 (1986).

The contrast between natural resource damage liability and response cost liability further indicates that CERCLA response costs are a restitutionary remedy. First, a responsible party can be held liable for response costs even though there is no property damage to compensate, because no actual release has yet occurred. 42 U.S.C. § 9604. Second, parties without an economic interest in the affected property can maintain an action for response costs. 42 U.S.C. §§ 9607(a)(4)(B), 9659(a). Finally, liability for response costs can greatly exceed the economic value of the affected property. *See* Abraham, *Environmental Liability and the Limits of Insurance,* 88 Colum. L. Rev. 942, 969 (1988).

The contrast between response costs and natural resource damages makes clear that response costs are an equitable restitutionary remedy, not a compensatory damage remedy. *Verlan, Ltd. v. John L. Armitage & Co.,* 695 F. Supp. 950 (N.D. Ill. 1988). Every court that has examined the nature of Superfund response costs liability outside of the insurance context has held that such costs are a form of equitable restitution. *See, e.g., United States v. Northernaire Plating Co.,* 685 F. Supp. 1410 (W.D. Mich. 1988) (no right to jury trial); *Wehner v. Syntex Corp.,* 682 F. Supp. 39 (N.D. Cal. 1987) (idem); *United States v. Dickerson,* 640 F. Supp. 488 (D. Md. 1986) (idem); *United States v. Conservation Chem. Co.,* 619 F. Supp. 162, 206 (W.D. Mo. 1985) (permitting assertion of equitable defenses); *Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F. Supp. 1049 (D. Ariz. 1984) (idem); *Penn Terra Ltd. v. Department of Envtl. Resources,* 733 F.2d 267, 278 (3d Cir. 1984) (response action not automatically stayed under Bankruptcy Code). In fact, this authority is so overwhelming that *even the policyholders admit that "the governmental remedy under CERCLA is equitable."* Brief of Policyholders, at 37. Therefore, this court must also hold that CERCLA response costs are a restitutionary remedy.

## II
## THE INSURANCE POLICIES DO NOT COVER
## RESTITUTIONARY REMEDIES

The insurance policies in this case provide that the insurer "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay *as damages* because of . . . property damage . . .". Certification order, at 3.[6] This language unambiguously extends coverage only to compensatory "damages" liability, not claims for restitutionary CERCLA response cost liability.

The majority makes several arguments attempting to show that this language is ambiguous. First, the majority asserts that the language is ambiguous because the policyholders were not subjectively aware of its meaning. Majority, at 876. Second, because the phrase "as damages" is "sandwiched into the general coverage provisions", the majority implies that the contract is structurally ambiguous. Majority, at 877. Third, the majority asserts that the "plain, ordinary meaning" of damages can include the costs of complying with coercive and restitutionary remedies. Majority, at 877. Fourth, the majority argues that because "56 judges" have held that identical policy language cover CERCLA response costs, the policy language is ambiguous. Majority, at 878–82. Finally, the majority asserts that ambiguous policy language must be construed against the insurers because the "average lay person" rule of insurance interpretation applies equally to "corporate giant[s]." Majority, at 882–83.[7] I will address each argument in turn.

---

[6]In fact, one of the insurance policies contains slightly different language, providing coverage "for all sums which the Assured shall be obligated to pay . . . *for damages* . . . on account of . . . [p]roperty damage . . .". Certification order, at 3. The majority does not separately address this language, implicitly holding that it has the same effect as that contained in the other policies. Because I agree with the conclusion, I do not separately address this language either.

[7]The majority also improperly purports to determine whether CERCLA response cost liability arises "because of . . . property damage" within the meaning of these policies. Majority, at 886. This question was not certified to us by the federal court.

A. *The policyholders' subjective understanding of the meaning of the policies is irrelevant.*

The majority argues that because these policyholders were subjectively unaware of the meaning of the policy's "as damages" clause, the policy language is unenforceable.[8] This argument was not advanced by the policyholders, and it flatly contradicts the law of this state.

Settled law requires this court to enforce an insurance policy according to its clear meaning and purpose, regardless of the coverage the insured may have thought he had. *Nevers v. Aetna Ins. Co.*, 14 Wn. App. 906, 908, 546 P.2d 1240 (1976). This court has on several occasions specifically declined to adopt the doctrine of reasonable expectations, under which the insured's subjective expectation of coverage determines the insurer's liability. *Keenan v. Industrial Indem. Ins. Co. of the Northwest*, 108 Wn.2d 314, 322, 738 P.2d 270 (1987); *State Farm Gen. Ins. Co. v. Emerson*, 102 Wn.2d 477, 485, 687 P.2d 1139 (1984). The policyholder's subjective understanding of the "as damages" provision is therefore irrelevant.

B. *The policies are not structurally ambiguous.*

The majority next implies that because the "as damages" clause is not in an exclusionary provision, but instead "sandwiched into the general coverage provisions," these policies are structurally ambiguous.[9] This court has explicitly rejected the doctrine of structural ambiguity. *State*

---

[8] "Alternatively, before the insurers can avoid indemnifying the policyholders, this court must be satisfied that the plain meaning of 'damages', as it would be understood by the average lay person, unmistakably precludes coverage for response costs, and any ambiguity is to be construed against the insurer." Majority, at 876.

"The court is not persuaded that, under the rules of insurance contract analysis in Washington, the words 'as damages' communicate these restrictions." Majority, at 876.

[9] "Here, *the structure of the subject contracts* defeats insurers' argument that 'as damages' precludes coverage for cleanup costs. The subject clause, 'as damages', is sandwiched into the general coverage provisions of policyholders' insurance contracts. This is an odd place to look for exclusions of coverage.

*Farm Gen. Ins. Co. v. Emerson,* 102 Wn.2d 477, 484, 687 P.2d 1139 (1984). Moreover, the general coverage provisions are exactly where one would expect to find language describing the basic coverage granted.

The absence of an exclusionary provision, if anything, strengthens the argument that "damages" do not encompass restitutionary liabilities like CERCLA response costs. Exclusions subtract from the coverage which an insurance policy would otherwise provide. *See Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group,* 37 Wn. App. 621, 627, 681 P.2d 875 (1984). The general coverage provisions of these policies only extend coverage to sums which an insured is legally obligated to pay "as damages." Therefore, they do not provide coverage from which a "damages" exclusion could subtract. These policies are structurally consistent.

C. *The phrase "as damages" plainly refers to compensation for injuries.*

    1. The standard definition of the word "damages"— reparation for detriment or injury sustained—plainly distinguishes damages from restitution.

The majority asserts that because standard dictionaries do not explicitly distinguish between "legal" and "equitable" claims, the "as damages" clause can reasonably be interpreted to provide coverage for CERCLA response costs. Standard dictionary definitions of "damages," *including the definition cited by the majority,*[10] in fact unambiguously distinguish damages from restitution. *"Damages" are compensatory*—reparation for detriment or

---

Furthermore, there is nothing more in the contracts. Under the title 'Exclusions', there is nothing in the enumerated exclusionary provision about 'damages.'" (Citation omitted. Italics mine.) Majority, at 877.

[10] "Standard dictionaries uniformly define the word 'damages' inclusively, without making any distinction between sums awarded on a 'legal' or 'equitable' claim. For example, *Webster's Third New International Dictionary* 571 (1971) defines 'damages' as 'the estimated reparation in money for detriment or injury sustained'." Majority, at 877.

injury sustained. *CERCLA response cost liability, in contrast, is restitutionary*—reimbursement of a benefit unjustly retained by a responsible party. See *supra.*

Of course, no dictionary explicitly defines damages as "not equitable relief." Dictionaries define what a word means, not everything a word does not mean. But standard dictionaries' definitions of "damages" do establish that the "plain, ordinary, and popular meaning" of "damages" *is* reparation for detriment or injury sustained. Because CERCLA response costs are not reparation for detriment or injury sustained, they do not fall within the "plain, ordinary and popular meaning" of damages.

2. The alternative definition of "damages"—cost or expense—is both informal and makes no sense when placed into context in the policy as a whole.

Unlike the majority, the policyholders recognized that if the word "damages" is given this plain, ordinary meaning, the insurance policies will not cover their CERCLA

---

This dictionary's complete entry for "damages" is:

3 damages *pl* : the estimated reparation in money for detriment or injury sustained : compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right <bring a suit for [damage]s> <was awarded compensatory [damage]s of $4000>—compare DAMNUM ABSQUE INJURIA; see COMPENSATORY DAMAGES, GENERAL DAMAGES, NOMINAL DAMAGES, PUNITIVE DAMAGES, SPECIAL DAMAGES 4 : EXPENSE, COST, CHARGE syn see INJURY

*Webster's Third New International Dictionary* 571 (1981).

Numerous other dictionaries contain virtually identical definitions. *See The Random House Dictionary of the English Language* 504 (2d ed. 1987); *The American Heritage Illustrated Encyclopedic Dictionary* 431 (1987); *Collins Cobuild English Language Dictionary* 353–54 (1987); *The Penguin Wordmaster Dictionary* 174 (1987); *Webster's New Universal Unabridged Dictionary* 315 (1983); *The American Heritage Dictionary* 364 (2d College ed. 1982); *Oxford English Dictionary* 14 (1981); *Oxford American Dictionary* 159 (1980); *The Concise Oxford Dictionary* 256 (1976); *Oxford Advanced Learner's Dictionary of Current English* 219 (1974); *Collins English Dictionary* 248 (1972); *Webster's New World Dictionary of the American Language* 356 (2d College ed. 1972); *Cassell's English Dictionary* 282 (1962); *Thorndike–Barnhart Comprehensive Desk Dictionary* 215 (1962); *Oxford English Dictionary* 14 (1961); *Webster's New International Dictionary of the English Language* 664 (2d ed. 1960); *Swan's Anglo–American Dictionary* 435 (1952).

response cost liabilities. They therefore vigorously advocate an alternative "cost or expense" interpretation of the word "damages." See Brief of Policyholders, at 11 ("Here, the policyholders are 'legally obligated to pay' the *'costs'* of conducting a comprehensive cleanup program . . .".) (Italics mine.)

The majority does cite *The Random House Dictionary of the English Language* in an attempt to show that damages can also mean "cost or expense". Majority, at 877. The majority neglects to mention that this dictionary labels the "cost or expense" definition informal. The entire definition reads:

> 2. damages, law. the estimated money equivalent for detriment or injury sustained. 3. Often, damages. *Informal.* cost; expense; charge: *What are the damages for the lubrication job on my car?*

*The Random House Dictionary of the English Language* 365 (1973).

This court should reject the "cost or expense" definition for several reasons. First, the phrase "legally obligated to pay as damages" lies at the heart of a legal document, insuring against legal liability. Every dictionary cited indicates that the "compensation" definition is appropriate to a legal context. In contrast, every dictionary that evaluates usage describes "cost or expense" as informal, colloquial or slang.[11]

Second, the "compensation" definition gives meaning to the "as damages" clause while the "cost or expense" definition renders "as damages" redundant. The "as damages" clause qualifies the phrase "all sums which the insured shall become legally obligated to pay." Certification order, at 3. Amounts payable in reparation for detriment or injury sustained constitute a subset of the amounts an insured is

---

[11]Only *Webster's Third New International Dictionary* and the related *Webster's New Collegiate Dictionary* do not identify the "cost or expense" definition of damages as informal, colloquial, or slang. These dictionaries do not specially identify such usages. *See* E. Sheehy, *Guide to Reference Works* 148 (10th ed. 1986).

"legally obligated to pay." The "compensation" definition therefore makes the "as damages" clause meaningfully qualify its referent.

In contrast, if interpreted to mean "cost or expense," the "as damages" clause redundantly repeats its referent. Because all sums which an insured is "legally obligated to pay" already constitute a "cost or expense" to the insured, the "as damages" clause becomes "mere surplusage, because any obligation to pay would be covered." *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348, 1352 (1987), *cert. denied,* 484 U.S. 1008 (1988).

This court will give force and effect to each clause of the insurance policy. *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.,* 111 Wn.2d 452, 456, 760 P.2d 337 (1988). The court must therefore reject the "cost or expense" interpretation of damages.

D. *Contrary results from other jurisdictions do not make the "as damages" language ambiguous under Washington law.*

The majority next emphasizes that "56 judges" have held that "damages" can include CERCLA cleanup costs. Majority, at 878.[12] While the judicial "head–count" is hardly dispositive, it is not nearly as one–sided as the majority implies. In addition to the three cases discussed by the majority, the following reported cases also hold that CERCLA response costs are not covered "as damages": *Cincinnati Ins. Co. v. Milliken & Co.,* 857 F.2d 979 (4th Cir. 1988) (applying South Carolina law); *Mraz v. Canadian Universal Ins. Co.,* 804 F.2d 1325 (4th Cir. 1986) (applying Illinois law); *Hayes v. Maryland Cas. Co.,* 688 F.

---

[12]Apparently included in this count are two Washington superior court decisions, as well as numerous unpublished foreign decisions. Neither has any precedential value under Washington law. *See* RAP 10.4(h); *Washington Bankers Ass'n v. Washington Mut. Sav. Bank,* 92 Wn.2d 453, 463, 598 P.2d 719 (1975); *State v. Ross,* 20 Wn. App. 448, 455 n.5, 580 P.2d 1110 (1978); *State v. Fitzpatrick,* 5 Wn. App. 661, 668, 491 P.2d 262 (1971).

Supp. 1513 (N.D. Fla. 1988); *Verlan, Ltd. v. John L. Armitage & Co.*, 695 F. Supp. 950 (N.D. Ill. 1988).

Of course, the court must reject the policyholders' suggestion that the mere existence of these conflicting decisions establishes that "damages" is ambiguous. The fact that a term in an insurance policy has been construed differently in other jurisdictions does not mean that the term is ambiguous under Washington law. *Crunk v. State Farm Fire & Cas. Co.*, 106 Wn.2d 23, 29–30, 719 P.2d 1338 (1986) (Goodloe, J., concurring), 106 Wn.2d at 31–32 (Dore, J., dissenting). The foreign cases discussed by the majority are ultimately important only for the persuasiveness of the reasoning they employ.

These cases are in fact not persuasively reasoned. For example, the stem case that sets out the rationale for holding that "damages" encompass CERCLA response costs is *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich. App. 579, 589–90, 336 N.W.2d 838 (1983) (quoted in majority, at 879). I disagree with its reasoning.

In *Aviex*, water used in putting out a fire at a chemical manufacturing facility caused toxic chemicals to seep into the ground, contaminating the groundwater underneath the manufacturer's property. 336 N.W.2d at 840. The manufacturer brought a declaratory judgment action against its insurer seeking to establish its rights under a standard form liability policy which contained an "as damages" clause identical to those at issue in the present case. 336 N.W.2d at 841, 840.

The appeals court found "persuasive" the insurer's argument that "damages" do not include the costs incurred in complying with injunctive orders. 336 N.W.2d at 842. However, the court noted that under the state act, the State was empowered to file suit "to recover the full value of the injuries done to the natural resources of the state". 125 Mich. App. at 589, 336 N.W.2d at 842–43. Because the court felt it was fortuitous "that the state has chosen to have the plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean–up itself

and then suing plaintiff to recover those costs", the court held that the insurer was liable under the policy. 125 Mich. App. at 590, 336 N.W.2d at 843.

*Aviex* consists of two syllogisms that do not connect. The *Aviex* court correctly recognized that if the State had sought a compensatory remedy (as state law empowered it to do), the insurance policy would have provided coverage for any resulting liability. The *Aviex* court also correctly recognized that if the insurance policy covered one form of equitable recovery—reimbursement of the State's cleanup costs—it would have been pointless to condition coverage on the form of equitable remedy—injunction or reimbursement—that the State chose to pursue.

*Aviex* errs by equating the compensatory damage remedy the State could have sought with the equitable remedies which the State in fact sought. The State's choice of remedy fundamentally affected the measure of recovery:

> [T]he distinction between recovery of cleanup costs and recovery of damages is not "merely fortuitous" to either the insured as a CERCLA and RCRA defendant or the insurer. The cost of cleaning up a hazardous waste site often exceeds its original value. On the other hand, some natural resources are of exceptional value and their destruction could greatly exceed the cost of cleaning up any hazardous waste contamination.

*Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, 842 F.2d 977, 986–87 (8th Cir. 1988) (applying Missouri law).

The other foreign cases cited in the majority opinion either depend on *Aviex* or do not involve CERCLA liability. *Aviex* was applied as controlling state law by two of the federal district court decisions the majority cites: *United States Fid. & Guar. Co. v. Thomas Solvent Co.*, 683 F. Supp. 1139, 1168 (W.D. Mich. 1988) (cited in majority, at 878) and *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F. Supp. 71, 75 (E.D. Mich. 1987) (cited in majority, at 878). A third case relies exclusively on *Aviex*. *Intel Corp. v. Hartford Accident & Indem. Co.*, 692 F. Supp. 1171, 1187 (N.D. Cal. 1988) (cited in majority, at 878). Finally, *CPS Chem. Co. v. Continental Ins. Co.*, 222 N.J. Super. 175, 536

A.2d 311, 316 (1988) (cited in majority, at 878) dealt with an insurer's liability for cleanup costs under a state environmental law, not under CERCLA. Therefore, no foreign case cited by the majority persuasively supports its holding.

E. *This court has squarely held that "damages" do not encompass restitutionary liabilities.*

The majority's analysis also directly contradicts this court's holding in *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740, 504 P.2d 1139 (1973). *Seaboard* is virtually indistinguishable from the present case.

In *Seaboard,* the Attorney General brought suit to enjoin an automobile dealer for "unfair methods of competition and unfair or deceptive acts or practices", and for the restitution of property wrongfully withheld by the dealer. 81 Wn.2d at 741–42. Like the underlying suit in this action, the underlying suit in *Seaboard* involved a public agency acting to protect the public interest. The court emphasized that the Consumer Protection Act specifically distinguished between injunctive, restitutionary, and damage remedies. 81 Wn.2d at 744–45. CERCLA similarly distinguishes between injunctive, restitutionary, and damage remedies.

The insurance policy in *Seaboard* provided coverage for "all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law . . . for money damages resulting from . . . unfair competition". 81 Wn.2d at 741. Similarly, the present policies provide coverage for "sums payable as damages because of . . . property damage."

In *Seaboard,* the court determined that in an action for damages for unfair competition, the measure of recovery is compensatory, not restitutionary. 81 Wn.2d at 743. Because the Attorney General's action only sought injunctive and restitutionary relief, the court held that "the dealer is not faced with the prospect of a judgment *for damages . . .*" (Italics mine.) 81 Wn.2d at 744. Similarly, although CERCLA provides for compensatory recovery for damages

to natural resources, in the underlying action the EPA has only sought reimbursement of its response costs, a restitutionary form of relief. Therefore, the court should hold that the policyholders are not faced with a judgment payable "as damages."

According to the majority, *Seaboard* holds that the Attorney General's suit for restitution would result in a judgment of "damages"; however, the suit seeking such "damages" for *unfair methods of competition* could not result in a judgment for damages *for unfair competition.* Majority, at 883–84. Given the reasoning in the rest of the majority's opinion, this explanation is totally untenable. If the word "damages" includes restitution, certainly "unfair competition" includes unfair methods of competition.

The majority's reasoning thus completely contradicts both *Seaboard's* rationale and result. *Seaboard* in fact requires this court to hold that these liability insurers are only required to indemnify their insured's compensatory liabilities, but not the cost of complying with equitable remedies.

The Court of Appeals has also squarely held that a liability insurer is not required to indemnify its insured's restitutionary liability. *Felice v. St. Paul Fire & Marine Ins. Co.,* 42 Wn. App. 352, 357, 711 P.2d 1066 (1985), *review denied,* 105 Wn.2d 1014 (1986).[13] Even the policyholders admit that *Felice* reached a proper result, conceding that the "as damages" clause "might also exclude sums paid in restitution of money had and received." Brief of Boeing Co., at 35. If "damages" does not encompass this form of restitution, it also does not encompass CERCLA response costs.

---

[13]The majority purports to distinguish *Felice* on the grounds that· "the proceeding was an action to remove the guardian, not a proceeding to recover damages." Majority, at 885 n.4. In fact, the complaint in *Felice* sought both Felice's removal as guardian, and restitution of attorney fees he had charged. 42 Wn. App. at 355. *Felice,* therefore, did involve a proceeding to recover "damages," at least as the majority would interpret the term.

In addition, numerous cases from other jurisdictions hold that liability insurers need not indemnify their insured's restitutionary liabilities, even if payable in money. *See, e.g., Thief River Falls v. United Fire & Cas. Co.,* 336 N.W.2d 274 (Minn. 1983); *Ladd Constr. Co. v. Insurance Co. of N. Am.,* 73 Ill. App. 3d 43, 391 N.E.2d 568 (1979); *Garden Sanctuary, Inc. v. Insurance Co. of N. Am.,* 292 So. 2d 75 (Fla. Dist. Ct. App. 1974); *Aetna Cas. & Sur. Co. v. Hanna,* 224 F.2d 499 (5th Cir. 1955); *Desrochers v. New York Cas. Co.,* 99 N.H. 129, 106 A.2d 196 (1954). For example, in *Desrochers,* the insureds had been enjoined to remove a culvert placed upon their land. In holding the insurer not liable for the cost of complying with the injunction, the court stated:

> The cost of compliance with the mandatory injunction is not reasonably to be regarded as a sum payable "as damages." Damages are recompense for injuries sustained. Restatement, Torts, *s.* 902. They are remedial rather than preventive, and in the usual sense are pecuniary in nature. 1 Sedgwick on Damages (9th *ed.*) *ss.* 2, 29. The expense of restoring the plaintiff's property to its former state will not remedy the injury previously done, nor will it be paid to the injured parties. . . .
>
> . . . .
> . . . In short, the expense of complying with the order is neither a sum which the insured is obligated to pay as damages, nor is it in any real sense equivalent thereto. No equitable principle requires the [insurer] to pay it, and it is not within the scope of its undertaking as a reasonable man . . . would interpret it.

(Citations omitted.) 99 N.H. at 131–33.

F. *The "average lay person" rule of insurance interpretation does not apply to corporations able to negotiate contract terms from a position of equal bargaining power.*

The "as damages" clause in these policies unambiguously limits coverage to compensatory damage remedies, not restitutionary remedies like CERCLA response costs. However, even if the phrase "as damages" were ambiguous, this term should not automatically be construed against the

insurer. The "average lay person" rule of insurance interpretation does not apply to corporate giants.

The principle that ambiguities in insurance policies must be strictly construed against the insurer derives from a recognition of the typical relationship between the purchaser of an insurance contract and the insurance carrier. Ordinarily, the carrier unilaterally drafts the insurance contract and thus, for policy reasons, is held responsible for any ambiguity in the language. See, *e.g.,* Shell Oil Company v. Accident and Casualty Insurance Company, at 14–15, No. 278953 (Cal. Sup. Ct., San Mateo County, July 13, 1988) as reprinted in Brief of Policyholders, exhibit 2.

This court early on adopted the rule of strictly construing policy language against the insurer in response to this inequality of bargaining power.

> "The policy, although of the standard form, was prepared by insurers, who are presumed to have had their own interests primarily in view; and hence, when the meaning is doubtful, it should be construed most favorably to the insured, who had nothing to do with the preparation thereof."

*Montana Stables v. Union Assur. Soc'y,* 53 Wash. 274, 276–77, 101 P. 882 (1909) (quoting *Matthews v. American Cent. Ins. Co.,* 159 N.Y. 449, 48 N.E. 751 (1897)). Numerous subsequent cases have reaffirmed both this rule, and the underlying rationale. *See, e.g., Stusser v. Mutual Union Ins. Co.,* 127 Wash. 449, 455, 221 P. 331 (1923); *Guaranty Trust Co. v. Continental Life Ins. Co.,* 159 Wash. 683, 688, 294 P. 585 (1930); *Braley Motor Co. v. Northwest Cas. Co.,* 184 Wash. 47, 52–53, 49 P.2d 911 (1935); *Kane v. Order of United Comm'l Travelers of Am.,* 3 Wn.2d 355, 359–60, 100 P.2d 1036 (1940); *Zinn v. Equitable Life Ins. Co.,* 6 Wn.2d 379, 385, 107 P.2d 921 (1940); *Doke v. United Pac. Ins. Co.,* 15 Wn.2d 536, 544, 131 P.2d 436, 135 P.2d 71 (1942); *Johnson v. State Farm Mut. Auto. Ins. Co.,* 70 Wn.2d 587, 590, 424 P.2d 648 (1967); *Safeco Ins. Co. of Am. v. McManemy;* 72 Wn.2d 211, 213, 432 P.2d 537 (1967); *Continental Ins. Co. v. Paccar, Inc.,* 96 Wn.2d 160, 167, 634 P.2d 291 (1981).

The majority acknowledges that at least some of the policyholders in the present case are "corporate giant[s]." Majority, at 883.[14] Because these insureds *do* possess the ability and expertise to negotiate the language of the policy, the "average lay person" rule applicable to the typical consumer insurance contract should not extend to this case.

In fact, this court has explicitly declined to apply these rules in a case involving a large corporate defendant:

> We are of the opinion that *the rule of construing the policy against the insurer does not fit the circumstances of this case.* Regardless of which party drafted the policy language, it is uncontested that neither party considered proration of the aggregate at the time they agreed on the unambiguous policy terms.

(Italics mine.) *Continental Ins. Co. v. Paccar, Inc.*, 96 Wn.2d 160, 167, 634 P.2d 291 (1981). *See also Transcontinental Ins. Co. v. Washington Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d 452, 456, 760 P.2d 337 (1988).[15] Indeed, application of such a rule might well unfairly benefit the corporate insured. See Shell Oil, at 18 (corporate insured intentionally left ambiguous language unclarified so that rule would apply).

## III

### The Majority's Holding Violates Public Policy

In addition to misapplying pertinent rules of construction, the majority opinion also ignores relevant public policy considerations. "[T]his case implicitly presents a grave question of policy, namely who should bear the cost of polluting our environment[.]" Majority, at 876 n.1. In interpreting an insurance contract, the court will look to public policy expressed in a relevant legislative enactment. *State*

[14]The majority asserts at page 883 that: "the policy in question [was] . . . prepared by the company's experts, with language selected by the insurer. The specific language in question was not negotiated . . .". I note that nothing in the District Court's certification order substantiates this recitation of "facts."

[15]The italicized language of this quotation simply belies the majority's assertion that *Paccar* "did not hold that a different rule should apply when corporations are involved." Majority, at 892.

*Farm Gen. Ins. Co. v. Emerson,* 102 Wn.2d 477, 481, 483, 687 P.2d 1139 (1984). Nevertheless, the majority opines that "[i]t is important to note the absence of public policy in the construction of insurance contracts." Majority, at 876 n.1. The majority's interpretation of these insurance policies ignores the public policy expressed by the United States Congress in enacting CERCLA.

A. *Congressional intent.*

Congress enacted CERCLA's extraordinarily novel liability provisions in order to impose the cost of cleaning up hazardous waste on those who have "profited or otherwise benefited from commerce involving [hazardous] substances." S. Rep. No. 848, 96th Cong., 2d Sess. 98, *reprinted in* Senate Comm. on Env't & Pub. Works, *Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Public Law 96–510,* at 308, 320, 97th Cong., 2d Sess. (1980) (statement of EPA administrator Costle). Congress intended that those who financially benefited from polluting activity internalize the health and environmental costs of that activity into their cost of doing business. S. Rep. No. 848, at 34, 13 n.2. This congressional intent is summarized in the slogan "make the polluter pay." *See* Developments in the Law, *Toxic Waste Litigation,* 99 Harv. L. Rev. 1458, 1477 (1986).

Congress clearly recognized that corporate polluters have reaped enormous benefits from their past inadequate waste disposal practices. These practices created significant short–term savings for polluters, resulting in higher profits for them, but caused enormous long–term harm in the form of environmental degradation. CERCLA response cost liability forces these polluters to disgorge these profits.

The insurers from whom these polluters now seek indemnification, in contrast, did not charge a premium to cover response cost liability. *See* Note, *CERCLA Cleanup Costs Under Comprehensive General Liability Insurance*

*Policies: Property Damage or Economic Damage,* 56 Fordham L. Rev. 1169, 1176 (1988). As Congress itself has recognized CERCLA's innovative provisions were simply unforeseeable at the time these policies were issued. *See* Superfund Amendments and Reauthorization Act of 1986, H.R. Rep. No. 253(I), 99th Cong., 2d Sess. 1, 109, *reprinted in* 1986 U.S. Code Cong. & Ad. News 2835, 2891 (disapproving "judicial trends regarding policy interpretation that have called upon old policies to pay for claims that were not envisioned at the time the policies were written"). By requiring these insurers to indemnify the corporate polluters for the cost of cleanup, the majority permits the polluters to both reap the benefits and avoid the costs attributable to their pollution. This directly violates the congressional intent that polluters internalize their pollution costs. *See* Brett, *Insuring Against the Innovative Liabilities and Remedies Created by Superfund,* 6 J. Envtl. L. 1, 52 (1986).

B. *CERCLA liability is fundamentally uninsurable.*

The majority holding also violates public policy because it requires insurers to insure liability which is fundamentally uninsurable: The innovative new features of CERCLA's liability scheme simply prevent insurers from calculating and charging premiums that bear any real relation to the risk of CERCLA liability.

CERCLA's liability provisions differ from ordinary tort liability in many important respects. First, CERCLA imposes an especially strict liability upon responsible parties. Liability attaches even to those who nonnegligently dispose of a hazardous substance using state of the art procedures. *See, e.g., United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir. 1988); *United States v. Price,* 377 F. Supp. 1103, 1114 (D.N.J. 1983).

Second, CERCLA liability is retroactive. Responsible parties who disposed of hazardous waste in a completely legal, nonactionable manner before the enactment of CERCLA are now potentially liable for response costs. *See,*

*e.g., United States v. Hooker Chems. & Plastics Corp.,* 680 F. Supp. 546 (W.D.N.Y. 1988).

Third, CERCLA regularly makes individuals liable for harms they did not cause. CERCLA imposes joint and several liability upon every responsible party connected with a hazardous waste site. 42 U.S.C. § 9607. Therefore, both the government and private parties may recover response costs from a "responsible party" with virtually no showing of causation. 1 C. Schraff & R. Steinberg, *RCRA and Superfund: A Practice Guide with Forms,* ¶ 2.05[3], at 2–26 (1989). *See also New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir. 1985) (CERCLA requires no showing of causation).

Fourth, private citizens without any proprietary interest in the property harmed have standing to sue to enforce CERCLA. 42 U.S.C. §§ 9607(a)(4)(B), 9659(a). To recover response costs, a private party need only show an outlay of costs and that the costs were incurred consistently with the National Contingency Plan promulgated by the EPA. *See* Brett, *supra* at 16 & n.87.

Fifth, CERCLA authorizes the initiation of response action in response to the *threat* of a hazardous waste release. 42 U.S.C. § 9604. For example CERCLA authorizes the government to recoup the costs of health assessment and health effects studies. 42 U.S.C. § 9607(a)(4)(D). Therefore, responsible parties may be held liable for CERCLA response costs even in the absence of any actual harm to persons or property. *See, e.g., United States v. Northeastern Pharmaceutical & Chem. Co.,* 579 F. Supp. 823 (W.D. Mo. 1984).

Sixth, CERCLA response cost liability is inevitable. Every hazardous waste containment system eventually will leak. Because CERCLA imposes liability even if hazardous waste is disposed of in a state of the art manner, every responsible party should expect eventually to be subject to CERCLA response liability.

Seventh, CERCLA response cost liability is essentially boundless, both in amount and duration. The EPA has an

almost unfettered discretion to incur and recoup whatever response costs it believes are necessary to clean up a site. 42 U.S.C. §§ 9604, 9621(a). Moreover, because the EPA currently refuses to grant settling parties releases from further litigation, a responsible party's liability exists indefinitely into the future regardless of how much it has paid to clean up a site. *See* Developments in the Law, *Toxic Waste Litigation,* 99 Harv. L. Rev. 1458, 1509 (1986). *But see* 42 U.S.C. § 9622(f) (providing EPA with discretion to enter into covenant not to sue).

CERCLA's broadly worded provisions mean that insurers have no way of predicting what insured conduct may lead to liability. For example, CERCLA defines "pollutant or contaminant" to include "any element, substance, compound, or mixture . . . which after release into the environment . . . will or may reasonably be anticipated to cause . . . [a toxic effect]". 42 U.S.C. § 9601(33). Because the toxic characteristics of any substance are dose dependent:

> [t]he application of the statute is highly dependent upon *ad hoc* and *post hoc* characterizations of a substance as a "pollutant or contaminant." . . . [Therefore], a party has literally no ability to conform his conduct to the requirements and prohibitions of the Act. A party also has little or no ability to avoid liability for the release of a pollutant or contaminant because he cannot know, in advance, whether any release will constitute actionable or prohibited conduct under CERCLA.

C. Schraff & R. Steinberg, *RCRA and Superfund: A Practice Guide With Forms* ¶ 1.02[5], at 1–11 (1989). CERCLA's other broadly defined terms create similar problems. *See, e.g., RCRA and Superfund,* ¶ 1.07.

CERCLA's conferral of standing upon parties who do not satisfy traditional requirements multiplies this uncertainty. "The broad liability provisions give enormous discretion to the responding party in deciding how to incur response costs with virtually no limit on the amounts recoverable." Brett, *supra* at 18.

CERCLA's retroactive strict liability provisions result in liability for the failure to reduce risks that cannot be discovered through the exercise of reasonable care. An insurer

who undertakes to insure response cost liability will therefore be liable for risks that are undiscovered and largely undiscoverable at the time the actions are taken. "Because the magnitude of such risks is inestimable—they are unknowable when insured against—it is impossible confidently to set a price for insurance against them." Abraham, *Environmental Liability and the Limits of Insurance,* 88 Colum. L. Rev. 942, 958 (1988).

Another factor making response costs particularly difficult to insure is CERCLA's imposition of liability for harms a party did not cause. Such liability:

> creates special uncertainty, because the probability of liability—and of consequent loss for the insurer—is affected by the behavior of nonpolicyholders whom the insurer cannot necessarily identify in advance. When the scope of liability is potentially very large, that uncertainty is magnified. . . .
>
>  . . . .
>  . . . In order to insure against this threat, insurers would have to make nearly impossible calculations based on both the potential behavior of the other parties whose activities might combine with the insured's to cause damage, and on the probability that these parties would prove to be judgment proof.

Abraham, at 959–60.

Finally, the inevitability of CERCLA response costs renders them totally uninsurable under traditional occurrence–type policies (such as the ones at issue in this case):

> [I]nsurance contracts do not ordinarily cover economic detriment of a type occurring so regularly in relation to an insured enterprise or activity that it is commonly regarded as a cost rather than a risk of that activity or enterprise. Second, insurance contracts do not cover economic detriment that is not fortuitous from the point of view of the person (usually the insured) whose detriment is asserted as the basis of the insurer's liability.

(Footnote omitted.) R. Keeton, *Insurance Law* § 5.3(a), at 278–79 (1971).

For example, it is an "elemental proposition" under Washington law that insurance policies do not cover losses which are expected or intended from the standpoint of the insured, "this generally being . . . against public policy to insure." *Detweiler v. J.C. Penney Cas. Ins. Co.,* 110 Wn.2d

99, 105, 751 P.2d 282 (1988). Thus, where an insured took a calculated business risk that pollution from a sewage plant would contaminate nearby property, we have held that the insured could not look to its insurer to indemnify it for its liability resulting from its failure to prevent the event. *Tieton v. General Ins. Co. of Am.*, 61 Wn.2d 716, 722, 380 P.2d 127 (1963). Because no containment system can permanently prevent the escape of hazardous waste, polluters who dump their wastes at the very least take a calculated business risk of eventually incurring CERCLA response cost liability.

A congressionally authorized study group report on the availability of private insurance for CERCLA liability recognizes that CERCLA's radically unique approach to the imposition of response costs renders the insured's potential liability so limitless that such liability cannot be assessed by prospective insurers seeking to set premium levels. *See* U.S. Dep't of Treasury, *Adequacy of Private Insurance Protection Under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980: A Report in Compliance With Section 301(b) of P.L. 96–105*, at 83–87, 94–95 (June 1983). In fact, since the enactment of CERCLA, pollution insurance has become unavailable in any insurance market. *E.g.,* Brett, at 44; Smith, Weishaar, Ledbetter & Light, *Hurricane SARA: An Introduction to the 1986 Superfund Amendments,* Toxics L. Rep. 1104, 1110 (1987). The fact that insurers are unable to provide coverage for response cost liability even today highlights the fundamental unfairness of finding such coverage in policies written years before CERCLA's radical new liabilities could possibly have been anticipated.

## IV
### CONCLUSION

Congress enacted CERCLA's innovative response cost liability provisions in order to properly address the threat posed by inadequate past hazardous waste disposal practices. CERCLA liability accordingly differs substantially

from ordinary tort liability. Normal tort liability results in a compensatory "damages" remedy. CERCLA response cost liability, in contrast, results in a restitutionary remedy.

The insurance policies at issue in this case require the insurer to indemnify the insureds for "all sums which the insured shall be legally obligated to pay as damages . . .". The plain, ordinary and popular meaning of damages, as recognized by the majority, is "reparation for detriment or injury sustained." Because CERCLA response costs do not constitute reparation for detriment or injury sustained, they do not constitute "damages" within the meaning of these policies. On–point mandatory precedent, the better reasoned foreign cases, and public policy all support this result.

I respectfully dissent.

DOLLIVER, J., concurs with CALLOW, C.J.

Reconsideration denied April 11, 1990.